Peter Mazzoni and Joseptine Mazzoni v. Commissioner. Charles J. Runzo and Lena Runzo v. Commissioner.
Mazzoni v. Commissioner
Docket Nos. 4823-67, 4824-67.
United States Tax Court
T.C. Memo 1970-37; 1970 Tax Ct. Memo LEXIS 324; 29 T.C.M. (CCH) 104; T.C.M. (RIA) 70037; February 10, 1970, Filed Edmund W. Ridall, Jr., and G. Gray Garland, Jr., 308 Frick Bldg; Pittsburgh, Pa., for the petitioners. Gary L. Stansbery and John W. Tissue, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined unreported income, deficiencies, and additions to tax against petitioners as follows: Unreported
Docket No.
Petitioners
Year
income
4823-67
Peter and Josephine
1956
$36,258.51
Mazzoni
1957
15,697.32
1958
84,801.45
1959
13,978.49
1960
7,712.07
1961
15,838.41
1962
9,625.07
Totals
$183,911.32
4824-67
Charles J. and Lena Runzo
1956
$49,837.25
1957
122,600.58
1958
928.22
1959
2,248.47
1960
71,306.95
1961
27,528.45
1962
22,075.76
1963
14,331.32
Totals
$310,587.00
*325 Additions to the tax
Docket No.
Deficiency
Sec. 6653(b)
Sec. 6651(a)
4823-67
$14,446.41
$ 7,839.52
5,564.74
2,782.37
48,092.78
24,046.39
5,337.86
4,500.99
($ 31.60)
2,331.68
1,165.84
6,944.47
3,472.24
3,499.44
1,749.72
$86,217.38
$45,557.07
($31.60)
4824-67
$22,659.24
$ 12,072.53
73,602.01
36,801.00
352.47
176.23
580.35
290.17 35,555.05
17,777.52
12,838.17
6,419.09
6,908.60
3,454.30
5,563.52
2,781.76
$158,059.41
$79,772.60 105 Subsequently, respondent has modified his claims of unreported income to reflect errors in the initial net worth computations upon which the deficiencies were based and to take into account items stipulated by the parties. Respondent has now conceded the taxable years 1958 with respect to the Runzos and 1961 and 1962 with respect to both the Runzos and the Mazzonis. The principal areas of dispute are: (1) the effect to be given to respondent's net worth computations; (2) the existence of a "likely source" of unreported income; (3) the amounts of cash on hand at specified times; (4) the adequacy of petitioners' books and records; (5) the obligation *326 of respondent to investigate "leads" as to the sources of cash on hand furnished by petitioners; (6) the proper handling of accounts payable in the net worth computations; (7) whether the additions to tax for fraud were proper as to any of the years involved; (8) the nature and amount of various specific adjustments to the net worth computations for the purpose of determining the amounts of the underlying deficiencies; and (9) the measure of the amount of underpayment to which the additions to tax for fraud attach in years when timely returns were not filed. Findings of Fact Some of the facts are stipulated and are found accordingly. Petitioners Peter and Josephine Mazzoni (hereinafter referred to individually as Peter or Josephine) were husband and wife who had their legal residence in Blairsville, Pennsylvania, at the time of filing the petition herein. [1] Petitioners Charles J. and Lena Runzo (hereinafter referred to individually as Charles or Lena) are husband and wife who had their legal residence in Blairsville, Pennsylvania, at the time of filing the petition herein. The Mazzonis filed joint individual income tax returns for the years 1956 through 1962 and the Runzos filed *327 joint individual income tax returns for the years 1956 through 1963 with the district director of internal revenue, Pittsburgh, Pennsylvania. Charles and Josephine were two of the five children of Sebastian (hereinafter referred to as Sam) and Constance Runzo. Sam initially came to the United States in 1890, but in 1896 he returned to Italy, where he purchased several houses and farms and a hardware store. Shortly thereafter, he married Constance and remained in Italy until 1912, when he returned to the United States and settled in Blairsville, Pennsylvania. In 1913, Constance and the Runzo children immigrated to the United States. Sam and Constance had five children, all but the youngest of whom were born in Italy. These children and the years of their birth are: petitioner Josephine, 1900; Catherine Cecchi, 1902; Jenny St. Philip, 1904; petitioner Charles, 1908; and Marie Runzo, 1914. Sam entered the produce business upon his return to the United States and operated a store in Blairsville in temporary quarters until 1914, when he purchased a tract with a two-story brick building. This property was later placed *328 in the joint names of Sam and Constance Runzo. The store business was thereafter conducted on these premises, and the family lived behind the store until the late 1930's. The original Blairsville store building contained two rental apartments from which Sam continued to derive rental income. In 1921, Sam extensively remodeled and enlarged the store and added five apartments and a storeroom to the premises. At this time, additional lines of produce and groceries were added. In addition to income from the store and from rental of portions of the building, Sam sold produce from a wagon in neighboring communities four days a week during the period 1914 to 1920. Sam also derived income during the years prior to 1930 from the annual sale of Christmas trees. Following the end of World War I, Sam realized considerable profit from extensive dealing in potatoes when the price increased markedly during this period. In approximately 1925, Sam sold, for an indeterminate consideration in currency, the properties he had acquired in Italy upon his return there in 1896. Sam continued the conduct of the Blairsville store until 1940, although he was relatively inactive after 1921, when his children *329 assumed primary responsibility for the conduct of the business. The children received no compensation, and members of the family were the sole source of labor for the store, which remained and has remained open seven days a week. Josephine and Charles worked in the store throughout this period. Catherine worked in the store until her marriage to Primo Cecchi in 1926. In the 106 1930's, Primo Cecchi began working in the store and Catherine returned on a part-time basis. Jenny permanently withdrew from the store upon her marriage in 1932. Marie did not remain in Blairsville and did not participate in the conduct of the store. It was Sam's custom to make substantial gifts to Josephine and Charles, who were primarily responsible for the operation of the business. Sam began to give money to Josephine as early as 1913 and to Charles in or about 1920. Sam also began to give money to Lena shortly after her marriage to Charles in 1936. These gifts, which were made on holidays and other special occasions, continued until shortly before Sam Runzo's death in 1954. In the early 1940's, Sam provided a total of $66,000 in currency, which was used to purchase $41,000 in United States Government *330 bonds for Charles and Lena and $25,000 for Josephine. During these years, the Sam Runzo family lived very frugally. They consumed merchandise that was unfit for sale in the store. Little or no funds were allotted for social or recreational activities. From time to time, Sam and Constance acquired certain real property, all located in Blairsville, from most of which they derived rental income. The rents were not changed from the date of acquisition until Sam's death in 1954. In 1929, they purchased an unimproved tract of land for $1,600, upon which they erected a rental dwelling in the early 1940's, from which they received $75 per month. In 1936, they purchased a house and lot for $2,585.10, for which they received $50 per month rent. In 1938, they purchased another dwelling for an unknown consideration which they occupied as their personal residence until the early 1940's when this property was rented for $55 a month. In 1940, they purchased a tract for $4,500 which included a brick house and a two-story concrete block building, which produced an aggregate monthly rental of $115. In 1941, they acquired a house for $2,500, for which they received $40 per month rent. In 1942, they *331 purchased a house for $3,000, which they rented for $50 per month until its sale in 1951 for $7,800. In 1943, they purchased a lot for $225, which was conveyed to petitioners Charles and Lena in 1951. In 1945, eight unimproved lots were acquired for an unknown consideration, which were never productive of income. Four of these lots were transferred to Primo and Catherine Cecchi in 1947. Three more were transferred to petitioners Charles and Lena in 1951. Sam gave the Blairsville store business to three of his children, namely, Josephine, Catherine, and Charles, in 1940, but he and Constance retained title to the property and received rent in the amount of $125 to $300 per month for the premises until 1956, when Constance conveyed the property to Charles for a nominal consideration. Sam and Constance jointly or Constance singly from time to time maintained several savings accounts in the Blairsville National Bank. The ledger sheets reflect a balance in December 1933 of $22,404.09, and are stamped "65% of the old balance." The entire sum was withdrawn in 1933. Accounts were maintained from April 1935 to April 1940 with a balance of $2,117.35 to $4,966.51; from March 1938 to June *332 1946 which fluctuated from $825.00 to $4,449.03; and from February 1937 through November 1954 which varied in that period from $500.00 to $3,659.70. Sam's will left his personal property and a life estate in all real property to Constance, who was living in Blairsville at the time of the trial, but she has been in poor health for the past 15 years. Lena Runzo was born in the United States in 1912. Prior to her marriage to Charles, she operated a small grocery store for her mother, but received no salary. She had no assets at the time of her marriage other than three life insurance policies; two for $2,000 each, and one for $500. One of the $2,000 policies was subsequently cashed in and the proceeds were utilized to purchase Government bonds for the Runzo children. She and Charles are the parents of five children, namely, Constance (born in 1937), Betty Lou (born in 1942), Loretta (born in 1944), Charles, Jr. (born in 1947), and Nancy (born in 1951). The formal education of both Charles and Lena ended with the first year of high school. Peter Mazzoni was born in Italy in 1897. He immigrated to the United States in 1913 and worked first for a railroad for about a year and a half *333 and later in several glass works, where his wages ranged as high as $18 a day. At the time of his marriage in 1926, he had saved approximately $15,000, which he turned over to Josephine. Neither Peter nor Josephine received any formal 107 education in the United States. They are the parents of two children, namely, Edward (born in 1928) and Eleanor (born in 1930). In 1929, Peter began working as a butcher in the Runzo Blairsville store, where he has remained employed until the present time. Josephine, Catherine, and Charles continued the operation of the Blairsville store as a partnership until 1943. In 1940, when the partnership assumed control of the store, gross volume was approximately $1,800 per week. The partnership arrangement proved unsatisfactory, and Charles became the sole proprietor of the business; his former partners then became his employees and received salaries. Charles has continued as the proprietor of this store until the present time. The Blairsville store is located in Blairsville, Pennsylvania, a town having a population of approximately 5,000. The store contained approximately 1,600 square feet of selling area in 1956, and was expanded during the years *334 in question to approximately 4,500 square feet. A full line of groceries, meat, and produce was stocked, and gross sales, as reported on tax returns, ranged during the years in question from $500,000 to slightly over $1,000,000. The tax returns were prepared and filed on a cash basis, except that inventories were used to compute gross profit. During the period 1956 to 1960, both A & P and Thorofare operated retail grocery stores in Blairsville, but Thorofare moved to a larger store outside of Blairsville in 1960. During much of this period, the pricing policy in the Blairsville store was to reduce prices on a substantial number of items so as to undercut competitors. This pricing policy was terminated after an eight-month strike by employees of the Blairsville store in 1960. Josephine managed the Blairsville store during the years in question, but it was customary for Charles to be in the store at least once each day. Charles, as lessee of Sam, improved the Blairsville store in 1950 at a cost of $9,680.49. Further improvements in the Blairsville store were made in the following amounts and years: $7,092.40 (1956), $47,659.79 (1957), $5,242.75 (1958), $1,227.31 (1959), $2,164.00 (1960). *335 In 1951, Charles and Josephine established a retail grocery store in Homer City, Pennsylvania, a town of approximately 2,500 people located ten miles from Blairsville. Charles managed this store, which stocked a full line of groceries, produce, and meat, and was operated as a 50-50 partnership between the Charles Runzo and the Mazzoni families. A Form 1065, U.S. Partnership Return of Income, was filed on behalf of this partnership for the years 1956 through 1963 with the district director of internal revenue, Pittsburgh, Pennsylvania. These returns reported gross receipts ranging from approximately $550,000 to slightly over $1,000,000. They were prepared and filed on the cash basis, except that inventories were used to compute gross profit. In 1954, the Runzos and the Mazzonis acquired the building which housed the Homer City store. Charles agreed to pay $21,000 in cash and assume a mortgage in the amount of $13,656.97. To facilitate the transaction, $15,000 was borrowed from the Homer City State Bank in August 1954 and an additional $12,000 was borrowed in December 1954 to satisfy the mortgage assumed on the premises. Both loans were paid in installments, the $15,000 loan being *336 finally satisfied in March 1961 and the $12,000 loan in December 1959. The Homer City store initially contained approximately 4,000 square feet of selling area, but prior to 1956 the adjacent Ragliani Building was purchased at a cost of $9,250, which enlarged the store to approximately 5,000 square feet of selling area. Additional investments were made in the Homer City store building in the following amounts and years: $5,616.42 (1955), $7,680.81 (1956), $7,945.47 (1957), $3,660.03 (1958), and $6,353.92 (1959). The so-called McMillen property was purchased during 1961 for the Homer City store partnership at a cost of $43,000, and the partnership issued a note in connection with this purchase in the amount of $30,000. In November 1955, equipment for the Homer City store was purchased at a cost of $5,130. The amount of $2,130 was paid in cash and the balance financed through Commercial Credit Corporation. This obligation was satisfied in full with a payment of $2,656.63 in June 1956. All employees but one of the Homer City store were on strike for four months during 1960. During the years in question, no credit sales were made in the Blairsville store. Charles had one credit *337 customer in the Homer City store, whose purchases were as high as $500 per week and total indebtedness at any one time as high as $5,000. 108 It was necessary in the course of operating the store to cash customers' checks in considerable volume. At least $10,000 was customarily maintained in each store for this purpose, but additional currency was frequently needed. Charles would provide such currency from his personal funds and would then repay himself when sufficient checks were cashed at the bank. A record of these transactions was maintained, but not retained for any appreciable period of time. It was not the custom with respect to either the Blairsville or the Homer City stores to deposit all receipts into the store bank accounts. Frequently, cash was returned to the stores after cashing customers' checks at the bank. The Blairsville store account, nevertheless, contained a balance as high as $46,000 in late 1960. In this same period, the Homer City store account rose as high as $38,000. The Blairsville and Homer City stores each had an actual gross profit of at least 14 percent of sales. The amounts of gross profit and the gross profit percentages of the Blairsville *338 and Homer City stores as disclosed on the tax returns, adjusted to eliminate indirect cost of goods sold and based on a 14 percent gross profit percentage, are as follows: Blairsville
Year
Gross profit
14 percent
per return
Percent
gross profit
1955
$ 47,510.58
11.3
$ 58,861
1956
50,501.88
10.8
65,464
1957
54,403.57
8.6
88,563
1958
79,549.90
8.2
135,815
1959
82,455.90
7.6
151,890
1960
52,725.99
8.4
87,875
1961
95,271.92
11.0
121,254
1962
83,388.66
10.1
115,587
1963
91,150.41
11.3
112,929
Homer City
Gross profit
14 percent
Year
per return
Percent
gross profit
1955
$ 52,561.19
11.3
$ 65,119
1956
58,500.80
10.7
76,542
1957
62,538.57
8.9
98,374
1958
79,807.88
9.2
121,445
1959
93,038.09
9.0
144,72 5
1960
68,098.00
10.6
89,940
1961
105,932.72
10.4
142,600
1962
98,385.13
10.1
136,375
1963
99,788.82
11.3
123,631
The ratio of cost of goods sold to average inventory for the Blairsville and Homer City stores as shown on the tax returns is as follows: Year
Blairsville
Homer City
1956
49
36
1957
47
36
1958
56
48
Year
Blairsville
Homer City
1959
53
53
1960
23
24
1961
26
31
1962
20
27
1963
18
22
*339 The normal rate of inventory turnover of comparable stores is 5 to 1. In January 1961, a retail grocery store known as the Big Apple Food Center was opened in Blairsville by the Charles Runzo and Mazzoni families, as a 50-50 partnership. This store, managed by Edward Mazzoni, operated in quarters formerly occupied by the Thorofare Market in the Einstein Building. Each family contributed $5,000 to provide initial capital for the store, which was closed in September 1967. Lena and Josephine were primarily responsible for maintaining business records with respect to the Runzo and Mazzoni families during the years in question. A book listing gross receipts, purportedly based upon cash register tapes, was maintained for each store. Entries were at times made on a daily basis; at other times totals were entered on a weekly or monthly basis. Lena maintained a ledger for the Homer City store which listed expenditures, other than wages and capital improvements. A monthly total was entered for merchandise and produce, along with the numbers, but not the amounts, of the checks which comprised this total. Checks written for items other than merchandise purchased for sale were listed individually, *340 as were cash expenditures. Lena prepared a summary sheet for each year, which was based upon information in the receipts and expenditures records and also included wages, social security taxes, unemployment taxes, property taxes, and inventory information. Inventory was determined by making a physical count of items on the shelves or in stock during the last week of December or the first week of January of each year. The items were counted at retail price and 17 to 20 percent was deducted in order to determine the value of the stock for inventory purposes. Josephine was responsible for the maintenance of a similar set of books for the Blairsville store. She personally kept only the cash receipts record, and the person serving as bookkeeper in the Blairsville store maintained the record of expenses. Similar books were maintained by Edward Mazzoni for the Big Apple Food Center. 109 Lena made summary sheets for the Blairsville store and the Big Apple using the same format as the Homer City store summaries. Lena was also responsible for maintaining rent records for property owned individually by the Charles Runzos as well as jointly with the Mazzonis and the Cecchis. The summary *341 sheets, along with receipts for capital expenditures, provided the basic information for the accountant who prepared Federal income tax returns for the individual petitioners and their partnerships and corporate enterprise. No audit was ever conducted by the accountant and no attempt was made by him to verify the information provided in summary form. In 1935, Peter, Charles, and Primo Cecchi as partners purchased the Einstein Building, also known as the Runzo Apartments, in Blairsville. for the consideration of $20,000. Each partner contributed one-third of the initial cost and has received one-third of the net rental income. During the late 1930's, extensive improvements and remodeling were undertaken. The owners provided funds for the minor improvements, but the bulk of the remodeling funds was provided by Sam Runzo. In 1955, gross rental from the Einstein Building was in excess of $14,000 per year. Charles began operating a bowling alley in the basement of the Einstein Building in 1936. This business was operated for more than 25 years but was closed after the years involved herein due to the introduction of automatic pin-setting machines. Charles and Lena acquired certain *342 properties prior to January 1, 1956, from which they received rent as indicated: Property
Year acquired
Cost
Monthly rental
Frame house
1940
$1,600.00
$ 40.00
Frame house
1941
1,800.00
Unknown
3 frame houses
1941
7,000.00
142.50
Frame house
1942
8,039.11
Personal residence
until 1952. Rented $50
per mo., 1952-1956.
Sold 1956.
Land
1940
187.50
Unknown
2 brick houses
1949
15,000.00
Unknown
Apartment
1951
10,000.00)
30.00 in
remodeled
1952-53
)
1951,
)
$152.50
)
thereafter
remodeled
1959
15,529.55)
Personal residence
1951
10,500.00
5 brick houses
1953
36,464.00
185.00
improvement
1955
3,536.00
2 houses, prior to
1950
Unknown
115.00
Charles and Lena constructed a block warehouse in 1955 at a cost of approximately $12,000, which began producing rental income in 1956. They purchased a brick house in 1957 at a cost of $4,500. Additions were made to the apartment portion of the Blairsville store building at a cost of $1,348.19 in 1958 and $7,954.82 in 1959. In 1959, the Thompson Building in Blairsville was purchased at a cost of $70,000. The Runzos assumed liabilities in this year *343 to the Thompson Estate, the Homer City State Bank, and one Alex Bennett in the amount of $81,000. Additions were made to the Thompson property at a cost of $24,812.94 in 1959 and $2,861.25 in 1960. In 1960, the Runzos purchased the socalled Moose property in Blairsville for use as a parking lot at a cost of $20,000. At least $19,000 of the consideration was paid in currency in $20 bills. In addition, Charles and Lena expended the following amounts in the indicated years on unimproved land, which remained unimproved while owned by petitioners through the years involved herein: $250 (1945), $25 (1947), $3,850 (1948), $500 (1951), $750 (1952), $1,500 (1954), $3,750 (1956), and $500 (1958). One lot, purchased at a cost of $1,000 in 1948, was sold in 1959. In November 1956, Charles and Peter purchased Bonnarigo's Garage at a cost of $62,000, which was paid in currency, one-half of which was provided by each of the partners. The partners constructed an addition to the garage in 1957 at a cost of $21,670. Petitioners received rental income, but in no way participated in the operation of the garage. Prior to 1956, Peter and Josephine expended the following amounts in the specified *344 years on real property which was held for rental purposes: $3,200 (1940), $4,250 (1941), $1,750 (1942), $4,000 (1943), $15,000 (1949), $40,000 (1955). They spent the following amounts on unimproved land, which produced no rental income: $187.50 (1940), $250.00 (1945), $25.00 (1947), $850.00 (1948), $750.00 (1952), $2,000.00 (1954). Peter and Josephine, along with Primo and Catherine Cecchi, purchased improved real property for the following amounts in the indicated years: $11,175 (1941), $1,000 (1942). In 1951, the United States Government condemned these properties for a consideration of $55,000 which was divided equally between the Mazzonis and the Cecchis. 110 During the years in question, the Mazzonis purchased properties as indicated: land, $3,750 (1956); three parking lots $17,000 (1958); Dean's Restaurant, $9,500 (1960). In the case of at least one of the parking lots mentioned above, the consideration was paid in currency consisting of $20 bills. In 1958, the Mazzonis purchased the Coffee House Hotel in Blairsville for a consideration of $17,660.13. They expended $85,514.86 in 1958 and 1959 to remodel the hotel and $32,884.63 in 1959 for the purchase of hotel equipment. *345 The contractor who performed the remodeling was paid in currency of small denominations. In January 1958, the Mazzonis expended $2,000 in currency for the purpose of posting a bond with the Pennsylvania Liquor Control Board. The Mazzonis formed a Pennsylvania corporation, Coffee House Hotel, Inc., in February 1959 for the purpose of owning and operating the Coffee House Hotel. The corporation issued 100 shares of capital stock - 26 each to Peter and Josephine and 24 each to their children, Eleanor Furnary and Edward Mazzoni. Neither Eleanor nor Edward provided any consideration for these shares. The Mazzonis made a cash contribution of $8,791.29 to the corporation in 1959 by means of paying hotel operating expenses through their personal checking account. The Mazzonis borrowed $10,000 from the Blairsville National Bank in 1958 and $18,000 in 1959. They also owed Emerson Dean, the party from whom they purchased Dean's Restaurant, $11,000 in 1960. The Mazzonis at all times resided in an apartment in the Blairsville store building. Josephine devoted her time to the Blairsville store so that much of the responsibility of caring for the Mazzoni children fell upon their grandmother, *346 Constance Runzo. Josephine was responsible for the Mazzoni family finances and customarily kept large amounts of currency in the Mazzoni apartment. Peter normally gave Josephine his paycheck, uncashed, and Josephine in turn provided Peter with money, if requested. The Mazzonis had personal cash on hand at the beginning of the period in issue, and amounts of that cash during the period are as follows: $65,000 on December 31, 1955, $45,000 on December 31, 1956, $45,000 on December 31, 1957, and zero on December 31, 1958. The Mazzonis maintained a joint savings account at the Blairsville National Bank prior to 1933. The ledger sheet is stamped "65% of the old balance," and the remaining balance of $1,961.52 was withdrawn in 1933. They also maintained a joint savings account from May 1935 until February 1941 which had a maximum balance of $997.29. A savings account was maintained in Peter's name from June 1938 until February 1941, which had a maximum balance of $1,633.86. Josephine maintained savings accounts as trustee for each of her children, which were opened prior to 1933. Edward's account reached $3,200 in 1949 and Eleanor's contained $1,176.77 in 1951 when each of the Mazzoni *347 children was 21 years of age. The Mazzonis or their children purchased a total of seven United States Treasury bonds in addition to those acquired with funds given by Sam Runzo prior to the years in question. Four of these seven were redeemed in 1951 prior to their maturity dates. In 1955, Peter and Josephine owned United States Treasury bonds valued at $25,000. They purchased an additional $3,000 worth of bonds in 1957, making a total of $28,000. The Runzos lived relatively frugally. Vacations were infrequent; little was allocated to recreational activities. The Runzos also customarily maintained large sums of cash in their residence. The Runzos had personal cash on hand at the beginning of the period in issue and amounts of that cash during the period are as follows: $90,000 on December 31, 1955; $70,000 on December 31, 1956; $7,500 on December 31, 1957; $7,500 on December 31, 1958; and zero on December 31, 1959. They purchased most of their groceries in their own stores and paid with cash. Charles surrendered certain life insurance policies on his life and received cash settlements as follows: New York Life, $5,830.00 (1960); Mutual of New York, $2,927.21 (1961); and Equitable *348 Life Assurance Society of the United States, $6,009.90 (1961). The Runzos realized long-term capital gains on account of sales of real property in the amount of $2,961.89 in 1956, $1,450.00 in 1959, and $930.22 in 1963. The Runzos maintained a series of bank accounts prior to the years in question, all in the Blairsville National Bank, which included a joint savings account from August 1937 until May 1945, which had a 111 maximum balance of $3,100.91, and a checking account in Lena's name from December 1948 until April 1949, which had a maximum balance of $831.72. Trustee savings accounts were maintained for the children as indicated with the maximum balances shown in parentheses: Constance, 1937-49 ($454.77); Betty Lou, 1942-49 ($238.65); Charles, 1948-49 ($200.00). In 1955, Charles and Lena owned United States Treasury bonds valued at $51,679.38. These holdings increased by $5,500 in 1957, $1,000 in 1958, $4,000 in 1959, and $8,575.83 in 1960, making a total of $70,755.21. In 1953, the Runzos or their children redeemed 10 United States Treasury bonds in the aggregate amount of $441.25 prior to maturity. Charles and Lena paid amounts for the high school or college education *349 of their children as indicated: $599.75 (1951), $351.50 (1952), $742.57 (1953), $686.25 (1954), $388.76 (1955), $1,527.00 (1956), $1,502.45 (1957), $1,842.00 (1958), $1,358.90 (1959), and $625.00 (1960). Charles Runzo, Jr., and Nancy were at home continually during the years in question. Loretta was at home until 1958, when she began attending boarding school. Betty was in boarding school and Constance was away at school or married and living away from home during all years in question. From September 1958 until the spring of 1960, Charles and Lena sent $70 or $75 per month to their eldest daughter, Constance, as rental money while her husband was in school. During the year 1960, the Runzos paid $635.22 to Kaufman's Department Store in Pittsburgh as payments on their account. Both the Runzo and Mazzoni tax returns for the year 1956 are stamped so as to indicate receipt by the district director of internal revenue, Pittsburgh, Pennsylvania, on April 17, 1957. The Mazzonis' 1959 return is similarly stamped April 29, 1960 and a late filing penalty of $31.60 was assessed with respect to this return. The following tables represent the net worth of the petitioners for the years 1956 *350 through 1963 in the case of the Runzos and of the Mazzonis, as well as the amounts of living expenses and other below the line adjustments together with the corrected adjusted gross income and the adjusted gross income as reported on the tax returns. Net Worth Statement -- Peter &
Josephine Mazzoni
Assets
12/31/55
12/31/56
12/31/57
Personal cash on hand
$ 65,000.00
$ 45,000.00
$ 45,000.00
Bank accounts
Runzo Apartments- partnership
7,266.66
7,100.00
6,933.33
Homer City store- partnership
24,833.91
32,535.95
46,108.14
Bonnarigo's Garage partnership
31,000.00
42,791.52
Coffee House Hotel, Inc.
U.S. Treasury Bonds
25,000.00
25,000.00
28,000.00
Real property
72,262.50
60,825.00
61,171.61
Equipment
Miscellaneous
Total
$194,363.07
$201,460.95
$230,004.60
Liabilities
Reserves for depreciation
$ 17,683.00
$ 15,866.00
$ 17,210.55
Mortgages & loans
Total
$ 17,683.00
$ 15,866.00
$ 17,210.55
Net Worth
176,680.07
185,594.95
212,794.05
176,680.07
185,594.95
Increase in net worth
8,914.88
27,199.10
Adjustments:
Transfers of property at adj. basis
11,812.50
Federal income tax payments
2,536.86
932.63
Personal living exp.
1,000.00
1,000.00
Adjusted Gross Income
24,264.24
29,131.73
Adjusted Gross Income Reported
7,962.79
13,581.73
Unreported Income
$16,301.45
$15,550.00
*351 Net Worth Statement -- Peter &
Josephine Mazzoni
Assets
12/31/58
12/31/59
12/31/60
Personal cash on hand
Bank accounts
$ 470.78
$ (427.28)
$ 197.06
Runzo Apartments- partnership
6,766.66
7,313.89
9,073.87
Homer City store- partnership
47,455.77
52,097.81
62,026.48
Bonnarigo's Garage partnership
42,113.72
41,872.53
40,803.22
Coffee House Hotel, Inc.
38,056.07
38,056.07
U.S. Treasury Bonds
28,000.00
28,000.00
28,000.00
Real property
163,590.64
172,661.68
182,161.68
Equipment
13,660.13
21,619.04
27,119.04
Miscellaneous
6,450.00
Total
$302,057.70
$361,193.74
$393,887.42
Liabilities
Reserves for depreciation
$ 21,550.58
26,651.44
$33,271.46
Mortgages & loans
27,000.00
45,000.00
56,000.00
Total
$ 48,550.58
71,651.44
$ 89,271.46
Net Worth
253,507.12
289,542.30
304,615.96
212,794.05
253,507.12
289,542.30
Increase in net worth
40,713.07
36,035.18
15,073.66
Adjustments:
Transfers of property at adj. basis
937.50
Federal income tax payments
3,059.25
1,833.16
3,282.12
Personal living exp.
1,000.00
1,000.00
1,000.00
Adjusted Gross Income
45,709.82
38,868.34
19,355.78
Adjusted Gross Income Reported
12,942.91
17,070.40
12,569.68
Unreported Income
$32,766.91
$21,797.94 *
$6,786.10
*352 Net Worth
Statement --
Charles & Lena
Runzo
Assets
12/31/55
12/31/56
12/31/57
12/31/58
12/31/59
Bank Accounts
($ 2,466.55)
$ 7,379.50
$ 2,660.93
($4,934.79)
($11,330.92)
Personal cash
90,000.00
70,000.00
7,500.00
37,463.31
7,429.34
on hand
Blairsville -
44,025.20
50,198.88
93,227.01
94,819.99
103,528.24
Equipment,
Inven- tory,
Cash
Homer City
24,833.92
32,535.96
46,108.15
47,455.76
52,097.82
store
partnership
Big Apple Food
0
0
0
0
0
Center
partnership
Runzo Apts.
7,266.66
7,100.00
6,933.33
6,766.66
7,313.89
partner- ship
Bonnarigo's
0
31,000.00
42,791.52
42,113.72
41,872.53
Garage
partnership
U.S. Treasury
51,679.38
51,679.38
57,179.38
58,179.38
62,179.38
Bonds
Real Property
122,990.21
125,805.94
177,954.29
185,045.23
303,569.85
Miscellaneous
0
0
10,494.01
14,686.75
14,686.75
Total
$338,328.82
$375,699.66
$444,848.62
$481,596.01
$581,346.88
Liabilities
Accounts
$ 8,124.05
$ 22,977.88
$ 19,883.70
$ 30,666.06
$ 37,804.95
Payable
Notes,
0
0
0
0
81,000.00
Mortgages
payable
Reserves for
33,447.77
38,710.49
48,832.88
59,943.05
71,021.52
dep.
Total
$ 41,571.82
$ 61,688.37
$ 68,716.58
$ 90,609.11
$189,826.47
Net Worth
296,757.00
314,011.29
376,132.04
390,986.90
391,520.41
296,757.00
314,011.29
376,132.04
390,986.90
Increase in
$ 17,254.29
$ 62,120.75
$ 14,854.86
$ 533.51
Net Worth
Adjustments,
8,832.66
8,333.77
12,165.01
13,285.16
Living exp.
including Fed.
income taxes
Long-term cap.
(1,480.95)
0
0
(725.00)
gains - life
ins. proceeds
Adj. gross
24,606.00
70,454.52
27,019.87
13,093.67
income
Adj. gross
11,744.64
10,179.47
27,019.87
13,093.67
inc. reported
Unreported
$12,861.36
$60,275.05
0
0
income
*353 Net Worth
Statement --
Charles &
Lena Runzo -
Continued
Assets
12/31/60
12/31/61
12/31/62
12/31/63
Bank Accounts
$ 14,352.13
($ 15,838.71)
($ 3,701.94)
( 1,430.96)
Personal cash on hand
0
50,405.96
18,798.86
2,088.17
Blairsville store -
111,286.68
115,662.21
130,939.13
126,132.00
Equipment Inventory,
Cash
Homer City store -
62,026.49
53,629.45
56,959.85
70,561.08
partner- ship
Big Apple Food Center
0
8,970.05
12,575.76
16,761.68
partnership
Runzo Apts. -
9,073.87
8,791.19
8,508.51
9,737.78
partnership
Bonnarigo's Garage -
40,803.23
39,733.92
38,664.61
37,595.31
partnership
U.S. Treasury Bonds
70,755.21
70,755.21
70,755.21
70,755.21
Real Property
328,595.10
329,632.66
329,632.66
328,662.88
Miscellaneous
21,136.75
14,686.75
14,686.75
14,686.75
Total
$658,029.46
$676,428.69
$677,819.40
$675,549.90
Liabilities
Accounts Payable
$ 38,526.93
$ 32,863.15
$ 34,192.05
$ 19,019.78
Notes, Mortgages
76,000.00
66,000.00
56,000.00
47,000.00
payable
Reserves for
88,960.53
103,672.29
118,948.61
134,224.92
depreciation
Total
$203,487.46
$202,535.44
$209,140.66
$200,244.70
391,520.41
454,542.00
473,893.25
468,678.74
Increase in net worth
$ 63,021.59
$ 19,351.25
($ 5,214.51)
$ 6,626.46
Adjustments, Living
10,337.30
11,891.39
14,474.97
13,795.90
expenses including Fed.
income taxes
Long-term capital gains
( 5,830.00)
( 8,937.11)
0
0
- life insurance
proceeds
Adjusted gross income
67,528.89
22,305.53
9,260.46
20,422.36
Adjusted gross income
9,422.07
22,305.53
9,260.46
20,422.36
reported
Unreported income
$58,106.82
0
0
0
*354 Ultimate Findings of Fact Charles and Lena Runzo have unreported income on which income tax has not been paid and is due in the following amounts and for the years specified: Year
Amount
1956
$12,861.36
1957
60,275.05
1959
-0-
1960
58,106.82
1963
-0- 113 Peter and Josephine Mazzoni have unreported income on which income tax has not been paid and is due in the following amounts and for the years specified: Year
Amount
1957
$15,550.00
1958
32,766.91
1959
21,797.94
1960
6,786.10
There are underpayments of tax due to fraud in respect of the Runzos for the years 1956, 1957, and 1960, and with respect to the Mazzonis for each of the years 1957 through 1960. Opinion These cases initially involved asserted deficiencies and additions to tax for fraud under section 6653(b) for each of the years 1956 through 1963 with respect to the Runzos and for each of the years 1956 through 1962 with respect to the Mazzonis. Respondent has now conceded the deficiencies with respect to the Runzos for 1958 and with respect to both the Runzos and the Mazzonis for 1961 and 1962; as a result of these concessions, any claim by respondent for additions *355 to tax also falls. Thus, we are left with the determinations as to whether there were deficiencies in tax with respect to the Runzos for the years 1956, 1957, 1959, 1960, and 1963 and with respect to the Mazzonis for each of the years 1956 through 1960 and the further determination as to whether additions to tax for fraud may properly be imposed for any or all of those years. As a preliminary matter, we note that the frame of reference, within which we must reach our decision, involves respondent's use of a net worth computation to compute the alleged omissions of income by petitioners. To support his use of the net worth computations, respondent asserts that petitioners' grocery stores owned and operated by petitioners were the "likely sources" of the alleged omitted income. Petitioners counter with the assertion that the proof herein shows that the stores were not such a likely source, claiming that their tax returns as filed and the underlying books and records clearly and accurately reflect their income from the stores. In so doing, petitioners recognize that, under Holland v. United States, 348 U.S. 121 (1954), *356 the mere existence of the books and records and the consistency thereof with their tax returns do not prevent respondent from determining income by means of a net worth computation. They contend, however, that the computation is so replete with errors as to warrant rejection as unworthy of belief. They further contend that, in particular, respondent has failed to give effect in the net worth computations to substantial amounts of currency accumulated in pre-1956 years by both the Runzos and the Mazzonis and expended by them during the years in issue, thereby accounting for the increases in their respective net worths. Effectiveness of Respondent's Net Worth Computations We will deal first with the petitioners' general characterization of respondent's net worth computations. In this connection, we note that petitioners have not contended that such computations are demonstrably so erroneous, and therefore arbitrary and capricious, as to require us to disregard them and put the entire burden of proof upon respondent, not only with respect to the fraud issue (which respondent, in any event, has under section 7454(a)), but also with respect to the deficiencies themselves (which petitioners *357 normally have and respondent normally does not have) under the doctrine of Helvering v. Taylor, 293 U.S. 507 (1935). Petitioners merely contend that, because of conceded errors and in light of the totality of the evidence introduced at the trial, we should accord little, if any, weight to such computations in determining whether the parties have carried their respective burdens of proof. We disagree. Admittedly, the net worth computations, both in the agent's report and as corrected and attached to the deficiency notices and as further corrected in respondent's answers, were inaccurate in several respects. Moreover, corrections in the computations were made in the course of stipulating certain of the facts herein, at the trial, and in respondent's briefs. Many of the errors were of a clerical nature and many involved small amounts. Some stemmed from respondent's failure consistently to treat items such as depreciation and outstanding checks. Certainly in these respects, it can not be gainsaid that respondent's mathematical gyrations leave a great deal to be desired. But, in no small degree, much of respondent's difficulty stemmed from petitioners' persistent dealings *358 in cash, their propensity for not depositing sizeable portions of their receipts from the grocery stores, and the lack of records pertaining to the costs of their acquisitions of property and 114 depreciation (both with respect to rental properties and the grocery businesses). In the final analysis, many of respondent's errors of commission and omission have been corrected by the stipulations of the parties and by the evidence adduced at the trial. Respondent is not required to dot every "i" and cross every "t" in order to win approval of his net worth computations. It is enough if there is reasonable certainty to the computations and we are convinced that this standard has been met in the instant situation. Banks v. Commissioner, 322 F. 2d 530, 547-548 (C.A. 8, 1963), remanding on other issues a Memorandum Opinion of this Court; Hoffman v. Commissioner, 298 F. 2d 784, 788 (C.A. 3, 1962), affirming on this issue a Memorandum Opinion of this Court. General Observations on the "Likely Source" and Cash Hoard Issues We move next to the two critical factual elements in this case - the likely source of unreported income and the cash on hand both at the *359 beginning of the first year at issue and in each of the other years involved herein. Resolution of these disputed elements affects the liabilities of petitioners with respect to both the deficiencies themselves and the additions to tax for fraud. In making the necessary determinations, we have been ever mindful of the fact that, with respect to the fraud issue, the burden of proof is on the respondent and that he must satisfy his burden by clear and convincing evidence. E.g., Jacob D. Farber, 43 T.C. 407, 419 (1965), affirmed in a supplemental opinion, 44 T.C. 408 (1965); Luerana Pigman, 31 T.C. 356 (1958). We have painstakingly examined the stipulation of facts, the exhibits, and the testimony of each of the witnesses. Our conclusions are based on our evaluation of the record as a whole, taking into account the demeanor of the witnesses and the credibility or lack of credibility of their testimony. "Likely Source" Issue We now turn to the "likely source" issue. Respondent has focussed on the Blairsville and Homer City stores as giving rise to unreported *360 income, thereby validating the increases in petitioners' net worths. See Holland v. United States, supra, at pp. 137-138. To sustain his position, respondent produced extensive testimony from persons familiar in varying degrees with net profit and gross profit margins in the grocery store field and petitioner countered with testimony of others with comparable expertise. Such a type of analysis is not unusual in constructing a foundation for the charge that taxpayers have failed to report all of their taxable income. Cf. Webb v. Commissioner, 394 F. 2d 366 (C.A. 5, 1968), affirming a Memorandum Opinion of this Court; Kurnick v. Commissioner, 232 F. 2d 678 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court; F. G. Bishoff, 6 B.T.A. 570 (1927), affd. 27 F. 2d 91 (C.A. 3, 1928). We have concluded that the net profit analysis is not particularly helpful in the instant case because of the difficulties of comparing petitioners' owner-operated stores with other supermarkets employing salaried managers. [2] These difficulties are accentuated by the fact that none of the outside witnesses had seen petitioners' *361 stores so as to be able to testify as to the extent to which their methods of operation and the mix of their sales were comparable to, or different from, operations and sales mix of other stores in the same geographic area. With respect to the gross profit percentage analysis, we have, as our findings of fact show, eliminated indirect costs of goods sold and computed the gross profit of the Blairsville and Homer City stores on the basis of the amount of receipts and the cost of goods sold, i.e., opening inventory plus purchases less closing inventory, as shown in the tax returns filed by petitioners. The resulting gross profit percentage ranges from 7.6 to 11.3 percent for the Blairsville store and from 8.9 percent to 11.3 percent for the Homer City store. By way of contrast, the pertinent witnesses (including petitioners' own witnesses) testified to gross profit percentages ranging from 14 percent to 19 percent. The competing Thorofare Market, located only 300 feet from the Blairsville store, operated with a gross profit percentage of approximately 16 percent during the years 1956 to 1960. Lena Runzo testified that inventory was taken by counting the merchandise at the retail price *362 and subtracting 17 to 20 percent to approximate the wholesale price. In this connection, we are constrained to note that we found Charles 115 Runzo's testimony with respect to pricing policies and gross profit margins to be so evasive as to be totally unacceptable. We are simply unwilling to believe that a man who had spent his entire working life in the grocery business and who owned one store and was a 50-percent partner in another, each of which, according to the tax returns, had annual gross sales of between $500,000 and $1,000,000, had no more knowledge of pricing policies and gross profit percentages than Charles Runzo demonstrated upon the witness stand. Finally, we think that the very high rate of inventory turnover of petitioners' stores (generally in excess of 20 to 1) as compared with what is considered a normal rate of turnover (5 to 1) indicates that actual receipts were probably higher than shown on petitioners' tax returns. [3]
*363 On the other hand, there are indications of some inefficiencies in the operations of the stores, of a failure to follow consistent pricing policies, of adverse effects from price wars and strikes (cf. Bernstein v. Commissioner, 267 F. 2d 879 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court, all of which could have depressed the gross profit margins of the stores. Giving effect to these potentially adverse factors and adopting a conservative approach, We think it has been amply demonstrated that the stores should have generated a gross profit margin of at least 14 percent during each of the years involved herein. Consequently, we are satisfied that the record herein clearly and convincingly reveals that the stores constituted a "likely source" of unreported taxable income during the years in question. Cash Hoard Issue Just as respondent has posited his case upon the net worth computation buttressed by clear and convincing proof of a likely source, petitioners have sough to explain the increases in net worth by proof of a cash hoard. Exclusive of the cash maintained in the stores, the Runzos claim cash on hand of $150,000 and the Mazzonis clim cash on *364 hand of $100,000 as of January 1, 1956. Lena was purportedly the custodian of the Runzo currency. Charles claims that he transferred all his cash to her shortly after their marriage in 1936, but neither claims to have counted the currency at that time or at any time until shortly after Sam Runzo's death in 1954. Charles then decided to count the currency, a task which the Runzos undertook in a most novel manner. They claim to have collected the currency, which was allegedly in $20 bills, from its various hiding places in their personal residence, placed it in $500 packets, and arranged these in shoe boxes, which we are told would accommodate approximately $50,000 each. The Runzos claim to have filled two boxes completely and most of a third box. Upon completion of this counting procedure, they purportedly redistributed the currency "under the carpet," i.e., to its accustomed hiding places. Unfortunately, since Josephine was unable to testify at trial, the only evidence we have as to the amount of the Mazzoni cash on hand is contained in the transcript of a Question and Answer Session with respondent's agents when Josephine estimated personal cash in excess of $100,000 at the time *365 of Sam Runzo's death. We are not required to accept such testimony in making our determination simply because it was not directly contradicted. E.g., Bodoglau v. Commissioner, 230 F. 2d 336, 340 (C.A. 7, 1956), affirming 22 T.C. 912 (1954). In particular, we have found the Runzos' testimony concerning the amount and counting of their cash hoard beyond the limits of unqualified credibility. We are entitled to make our own evaluation of the credibility of the testimony, based upon all the evidence before us, and to exercise our own judgment, both as to the amount of the cash on hand at the beginning of the period and the amount of such cash at the beginning of each year during the period. See, e.g., Henry B. Mikelberg, 23 T.C. 342, 351-352 (1954), affirmed per curiam, 234 F. 2d 34 (C.A. 3, 1956); Michael Potson, 22 T.C. 912, 928-929 (1954), affirmed sub nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). This we have done. Accordingly, we have concluded that there is clear and convincing evidence that the Runzos had no more than $90,000 personal cash on hand as of December 31, 1955 and that, *366 of that cash, they had no more than $70,000 on hand as of December 31, 1956, no more than $7,500 on hand as of December 31, 1957, and no more than $7,500 on hand as of December 31, 1958. Similarly, we have concluded that the Mazzonis had no more than 116 $65,000 personal cash on hand as of December 31, 1955, no more than $45,000 cash on hand as of December 31, 1956, and no more than $45,000 cash on hand as of December 31, 1957. [4]
We here note merely some of the elements of evidence which we considered in reaching our conclusions in this regard. We have recognized that it was the custom of both the Runzo and the Mazzoni families to deal in currency and to maintain large amounts of currency in their personal residences. We also believe that Sam Runzo customarily made substantial gifts to his children, Josephine and Charles. The fact that these two *367 children devoted their lives to the operation of the family business would clearly justify a degree of generosity toward them which Sam Runzo did not exhibit toward his other children. We believe that petitioners' relatively frugal living habits enabled them to save significant amounts of the currency which came into their possession. Our judgment has also been swayed by our evaluation of the income-producing potential of petitioners' stores and the amounts expended to purchase or improve income-producing property during the years in question. For example, each family expended $31,000 to purchase the Bonnarigo garage in 1956; the Runzos spent some $47,000 on improvements to the Blairsville store in 1957; the Mazzonis during 1958 and 1959 expended at least $135,000 on the purchase and improvement of the Coffee House Hotel. We cannot believe that all of the funds for investments of this magnitude were derived from current income from petitioners' grocery stores in Blairsville and Homer City. A finding that all improvements and purchases were funded from current income would produce substantial unexplained variations in the income from the stores. A corollary would be that the stores *368 should have generated income in prior years which would have resulted in petitioners' possessing larger cash hoards than claimed or in their enjoying a far more lavish standard of living than the testimony indicates. On the other hand, we have considered the borrowings of petitioners to finance certain acquisitions, in particular in connection with the purchase and improvement of the Homer City store building in 1954. We are fully cognizant of valid reasons for borrowing and conserving cash, such as anticipating emergencies or developing lines of credit, but we do not believe petitioners would have borrowed as extensively as indicated by the evidence if they had cash on hand in the amounts claimed Finally, we are constrained to note that even if we were to accept petitioners' claims as to the amounts of cash on hand and the times when it was expended, there would still be unexplained increases in net worth, according to petitioners' own figures as set forth in their briefs. Adequacy of Petitioners' Books and Records Before leaving the issues of "likely source" and "cash hoard," there are two ancillary issues which require attention. Petitioners claim that their books and records *369 fully and accurately reflected their income from the Blairsville and Homer City stores. Concededly, the petitioners' tax returns reflected all of their income from the stores that was indicated on books, and respondent has not demonstrated any inconsistency between the book entries and the supportive material, namely, cancelled checks, invoices, and cash register tapes, which petitioners supplied. Nevertheless, as our findings of fact reveal, the books and records, which are mainly in pencil, utilize a single entry system to reflect gross receipts, purportedly based upon cash register tapes, and expenses, which were principally paid by check. No audit of these books was ever conducted, nor were consistent recording practices followed in that gross receipts were at times recorded on a daily basis and at other times for periods ranging up to a month. When this state of affairs and, more importantly, our conclusion that there was clearly a "likely source" of unreported income and that petitioners' claimed cash on hand was overstated are considered, the most that can be said is that the tax returns and the books and records were consistent. It is axiomatic that consistency is not to be *370 equated with truthfulness. (See Holland v. United States, supra, at pp. 133-134.) Accordingly, we reject petitioners' contention that their books and records should be held to be determinative of their income from the stores. 117 The "Leads" Issue Petitioners also argue that respondent has failed to discharge an affirmative obligation to check the "leads" which they furnished regarding the sources of their cash accumulations. The so-called "leads" rule had its genesis in Holland v. United States, supra, and is applicable to civil as well as criminal cases. See Fairchild v. United States, 240 F. 2d 944, 948 (C.A. 5, 1957). We need not dwell upon the extent of respondent's obligation to investigate under the circumstances of this case where the opportunities for corroboration of petitioners' cash hoard tale were extremely limited - there were no reasonably available non-family sources of information and Sam Runzo, the alleged source of much of the cash, was dead by the time respondent's investigation commenced. The fact is that respondent is *371 not required to investigate leads. He may, if he chooses, fail to do so and run the risk that "the trial judge may consider them as true and the Government's case insufficient." See Holland v. United States, supra, at p. 136. The most that can be said in this case is that respondent gambled and, as it has turned out, has won his gamble in part. Moreover, the fact that respondent chose to rely on petitioners' grocery stores as a "likely source" further tempered the need to negative other potential nontaxable sources of the net worth increases. United States v. Massei, 355 U.S. 595 (1958); Shahadi v. Commissioner, 266 F. 2d 495, 500 (C.A. 3, 1959), affirming 29 T.C. 1157 (1958). Accounts Payable Another element, which is the subject of dispute, relates to the respondent's inclusion in his net worth computations of the accounts payable for the stores. The parties agree that these accounts payable relate exclusively to purchases of merchandise and they are also in agreement as to the amounts involved. Petitioners object to their inclusion in the net worth computations on the grounds that they are cash basis taxpayers. Obviously *372 the inclusion or exclusion of accounts payable can have a significant effect of shifting reconstructed income from one year to another when different rates of tax may be applicable. In support of their objection, petitioners rely upon the oft-stated principle that when respondent attempts to reconstruct income by way of a net worth computation, the reconstruction must be reconciled with the method of accounting utilized by the taxpayer. See Fowler v. United States, 352 F. 2d 100, 103 (C.A. 8, 1965); United States v. Vardine, 305 F. 2d 60, 64 (C.A. 2, 1962). In the usual sense, a net worth computation is a statement of a person's financial condition at a given point of time and it is unquestionably proper to include all assets and liabilities. Indeed, if assets are included but liabilities are not, or vice versa, there will be an increase or decrease in net worth from that of the prior year which will not accord with the facts. See Scanlon v. United States, 223 F. 2d 382, 389 *373 (C.A. 1, 1955); United States v. Vardine, supra.In tax cases, however, the purpose of such a computation is to make a comparison between the results of the computation and the amount of income shown on the tax returns in order to determine whether the taxpayer has received income which he has not reported. Unless the original net worth computation is adjusted to take into account items which are not included in the calculation of the tax lialibility, the comparison will be distorted. But this need for adjustment does not extend to liabilities which are directly related to assets which properly remain in the net worth computation. See Scanlon v. United States, supra.Nor does it extend to liabilities, such as accounts payable, which are not disregarded by the taxpayer in reporting income on his return. See United States v. Vardine, supra. Applying the foregoing principles, it seems clear that at least to the extent that the accounts payable represented the unpaid purchase price of the closing inventory counted as an asset in the net worth computations, they were properly included as liabilities in the computation. [5] But, beyond this, the *374 fact is that petitioners did not disregard the merchandise accounts payable in computing their income from the stores. Their books and records and their returns reflect the use of inventories, which by hypothesis includes merchandise on hand at the beginning and end of each year and merchandise acquired during the year, irrespective of whether payment had been made therefor. In essence, petitioners adopted a hybrid method of accounting involving the use of inventories combined with the cash method 118 - a procedure which has been found acceptable for tax purposes. Stoller v. United States, 320 F. 2d 340 (Ct. Cl. 1963); Glenn v. Kentucky Color & Chemical Co., 186 F. 2d 975 (C.A. 6, 1951); Estate of Howard T. Roe, 36 T.C. 939, 952 (1961); Stanford R. Brookshire, 31 T.C. 1157 (1959), affd. 273 F. 2d 638 (C.A. 4, 1960). Under these circumstances, we hold that respondent's inclusion of the merchandise accounts *375 payable of the stores was clearly correct. The Fraud Issue Section 7454(a) specifies that the burden of proving fraud is upon the respondent and he must satisfy this burden by clear and convincing evidence. See, e.g., Jacob D. Farber, supra; Luerana Pigman, supra. Fraud will not be imputed or presumed and mere suspicion is insufficient to sustain a finding of fraud. See, e.g., Carter v. Campbell, 264 F. 2d 930, 935 (C.A. 5, 1959). At the same time, it is axiomatic that direct proof of fraud is seldom possible and that a finding of fraud can be based on the taxpayer's conduct in relation to the underlying transaction. See Leon Papineau, 28 T.C. 54, 57-58 (1957). At the same time, we should not infer unreported income merely from increases in net worth and then infer fraud from that unreported income, thereby piling inference upon inference. Cf. Valetti v. Commissioner, 260 F. 2d 185 (C.A. 3, 1958); Goldberg v. Commissioner, 239 F. 2d 316 (C.A. 5, 1956). Nevertheless, the consistent failure to report substantial *376 amounts of income over a period of years is evidence of fraud. Schroeder v. Commissioner 291 F. 2d 649 (C.A. 8, 1961), affirming a Memorandum Opinion of this Court; Schwarzkopf v. Commissioner, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; Rogers v. Commissioner, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938). Given the foregoing guidelines and recognizing that "bare figures have a way of acquiring an existence of their own, independent of the evidence, which gave rise to them" (see Holland v. United States, supra, at p. 128), we have exercised extreme care in our use of the net worth computations for the purposes of our determination of the issue of fraud. In order to make certain that we have not relieved respondent in any respect from his burden of proof on this issue, we have accepted as a starting point petitioners' calculations of net worth based upon stipulated items in the computation and petitioners' version of the contested items with two modifications: (1) We have replaced petitioners' claims as to initial personal cash hoard and the time of use thereof with *377 our own conclusions in these respects based upon what we consider to be clear and convincing evidence as revealed by the record herein, i.e., we have credited petitioners with the maximum amounts of such cash which we think they could have had on the pertinent dates (see pp. 41-45, supra), and (2) we have included the merchandise accounts payable of the stores (see pp. 48-51, supra). We have also adjusted petitioners' computation to reflect below the line adjustments favorable to petitioners and have made no allowance whatsoever for personal expenses. With respect to the latter element, we note that our subsequent acceptance of all but $1,000 of respondent's claims for personal expenditures in the case of the Runzos is not based upon affirmative proof of such amount but rather upon petitioners' failure to sustain their burden of proof that such amounts were not so expended. On the other hand, we think it is clear that the Runzos had some living expenses and that a minimum amount of $3,500, $500 per member of the family of seven, can be convincingly revealed by the record. We adopted the foregoing self-imposed limitations because of the fact that practically all of the testimony *378 at the trial was directed to the issues involving the profit margins of the stores and the cash hoards, with the result that the evidence on other elements is far from exhibiting the degree of clarity which may be required insofar as the fraud issue is concerned. In so doing, we do not mean to imply that such a procedure must necessarily be followed in all similar situations. Its use simply serves our purposes in this case. [6] 119 The results of our calculations are set forth in the following tables. Respondent's
computation
(adjusted
Petitioners'
for personal
computation
cash on
(adjusted
hand -- i.e.,
for
cash hoard --
cash hoard
from pre-1956
and accounts
Increase
accumula-
Runzo
payable)
(Decrease)
tions)
1955
$310,896
$296,757
1956
328,577
$17,681
314,011
1957
390,690
62,113
376,132
1958
372,781
(17,909)
389,986
1959
392,617
19,836
384,091
1960
461,300
68,683
454,542
1961
416,199
(45,101)
472,893
1962
451,675
35,476
466,678
1963
465,283
13,608
473,217
Mazzoni
1955
$189,041
$176,680
1956
197,762
$8,721
185,595
1957
222,277
24,515
212,794
1958
239,554
17,277
253,50 7
1959
283,847
44,293
289,542
1960
306,334
22,487
304,616
1961
288,126
(18,208)
320,893
1962
303,838
15,712
330,031
*379 Increase
Adjusted
or
gross
decrease
per return
most
plus
favorable
favorable
Increase
to
below line
Runzo
(Decrease)
petitioner
adjustments
1955
1956
$17,254
$17,254
$ 13,225
1957
62,121
62,113
10,179
1958
13,854
( 17,909)
27,020
1959
(5,895)
(5,895)
13,819
1960
70,451
68,683
15,252
1961
18,351
(45,101)
31,242
1962
(6,215)
(6,215)
9,260
1963
6,539
6,539
20,887
Mazzoni
1955
1956
$8,915
$8,721
$7,963
1957
27,199
24,515
13,582
1958
40,713
17,277
12,943
1959
36,035
36,035
17,070
1960
15,074
15,074
12,570
1961
16,277
(18,208)
21,608
1962
9,138
9,138
17,590
With respect to the Runzos, the above tables show a substantial excess of increases in net worth over the reported income for 1957 and 1960. With respect to 1956, there is a discrepancy of approximately $4,000 without any allowance whatsoever for living expenses. Especially if a minimum amount of $3,500 for personal expenditures is added, there is a sizeable discrepancy between available assets and reported income even for 1956. With respect to 1959 and 1963, even if we added back the $13,285.16 and $13,795.90 respectively *380 sustained as personal expenses (see pp. 30-31, supra), the aggregate amount of alleged increase in adjusted gross income would equal only $13,093.67 and $20,422.36, respectively, which amounts do not exceed the reported adjusted gross income for those years, so there are no deficiencies to which the fraud can attach. We also note that respondent made no allowance in 1959 for the expenditure of personal cash, which we have found amounted to $7,500. As far as 1958, 1961, and 1962 are concerned, we have already noted that respondent has abandoned his claims for deficiencies so that there is no need for us to consider any addition to tax for fraud for those years. With respect to the Mazzonis, the above tables show a substantial excess of increases in net worth over the reported income for each of the years 1957 through 1960. With respect to 1956, even if we were to adopt respondent's view that the Mazzonis had $1,000 of living expenses, the excess of net worth increase over unreported income would be less than $1,000. We recognize that respondent's revised net worth computation shows a substantially larger excess ($36,301.45), but we are unable to conclude that respondent has carried *381 his burden of proof as to fraud for that year. In the absence of fraud, the year 1956 is barred by the period of limitations, since, although the Mazzonis executed consents extending such period more than three but less than six years after the joint return for that year was filed, respondent has expressly abandoned any claim for a deficiency based upon 120 an omission of more than 25 percent from gross income under section 6501(e). We are still left with the necessity of determining whether the returns filed by the Runzos for 1956, 1957, and 1960 and by the Mazzonis for each of the years 1957 through 1960 were fraudulent so as to justify the 50 percent addition to tax under section 6653(b). We have already pointed out (see p. 57, supra) that, in each of the years specified, the computations which we have adopted show a substantial excess of increases in net worth over reported income. We have also pointed out that there is clear and convincing evidence both that there were unreported gross receipts from the Blairsville and Homer City stores and that the taxpayers did not have anything like the amounts of personal cash on hand which they claimed. Beyond these factors, the books *382 and records of the stores failed to reflect systematic record-keeping procedures in that gross receipts were entered at intermittent intervals and the expenditures ledger to a large degree consisted of information in summary form, all of which has led us to conclude that there were gaps in such books and records with the result that they were, to put it simply, only consistent with the tax returns rather than accurate. Moreover, it is clear that large amounts of cash were not deposited in bank accounts and cash was shuttled back and forth between the taxpayers individually and the stores, making external verification of store receipts mutually impossible. In addition, given our doubts as to the unqualified credibility of petitioners' testimony as to the existence and use of their claimed cash hoards, we cannot overlook their penchant for conducting their personal business in cash rather than depositing any substantial amounts of their claimed personal funds in bank accounts. Finally, although the rental properties were not in issue as a source of unreported income, we need not, in the total context of these cases, ignore the fact that records as to investments in rental properties *383 were for all practical purposes nonexistent. Granted that petitioners had limited educational backgrounds, that element does not in and of itself provide dispensation (cf. John Marinzulich, 31 T.C. 487 (1958)) and, in any event, we are satisfied that, in the area of their financial operations, petitioners had a reasonably high level of intelligence, even if they cannot be described as sophisticated. All in all, on the basis of the record as a whole, there is clear evidence beyond the increases in net worth to convince us that petitioners in fact received substantial amounts of unreported income and deliberately failed to report the same in the years specified. Our conclusion that there was fraud in respect of those years follows inevitably. Cf. Foster v. Commissioner, 391 F. 2d 727, 733 (C.A. 4, 1968), affirming a Memorandum Opinion of this Court; Agnellino v. Commissioner, 302 F. 2d 797 (C.A. 3, 1962), affirming as to this issue a Memorandum Opinion of this Court; Shahadi v. Commissioner, supra; Woodham v. Commissioner, 256 F. 2d 201 (C.A. 5, 1958); Schwarzkopf v. Commissioner, supra; Drieborg v. Commissioner, 225 F. 2d 216 *384 (C.A. 6, 1955), affirming a Memorandum Opinion of this Court. The Underlying Deficiencies Before dealing with the particular years involved and the particular items of respondent's net worth computations which petitioners dispute, certain general observations are in order. With respect to this aspect of the case and in contrast to the situation in respect of the existence of fraud, the burden of proof is entirely on petitioners with respect to the deficiencies asserted by respondent, even though the foundation of such deficiencies is the net worth computations. E.g., Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960); Lawrence Sunbrock, 48 T.C. 55 (1967); compare Foster v. Commissioner, supra, at 735. Nor is petitioners' position improved by the fact that the apparent increases in net worth on the basis of which the deficiencies, with so-called below the line adjustments, are calculated do not correspond to the amounts of income shown to have, in all probability, been realized from the "likely source." Such discrepancies are the inevitable consequence *385 of the fact that net worth computations reflect the years when assets were acquired or money was expended - i. e., when the apparent unreported income surfaced, and not when it was in fact realized. See Polizzi v. Commissioner 265 F. 2d 498, 501 (C.A. 6, 1959), affirming in part and reversing in part a Memorandum Opinion of this Court. The record in this case is a welter of confusion with regard to various items which make up the net worth computations, 121 including the so-called below the line adjustments. However, our task has been lightened by the fact that many of the items have been stipulated and that respondent's reply brief specifically states that only the items dealt with in that brief are disputed and that, in all other respects, respondent accepts the computations appended to petitioners' original brief. Accordingly, we will hereinafter deal only with those items, noting that two disputed items, the alleged initial cash hoards and the timing of the use thereof and the merchandise accounts payable of the stores, have been dealt with elsewhere in this opinion. See pp. 41-45, 48-51, supra. With respect to the cash hoard, we previously have set forth our *386 conclusion that respondent has clearly and convincingly shown that petitioners did not have more than the amounts of cash on hand at specified times as shown in our findings of fact. We also conclude that petitioners have sustained their burden of proving, for the purposes of the underlying deficiencies, that they in fact had such amounts of cash. The deficiencies involved are for 1956, 1957, and 1960 in respect of the Runzos and 1957 through 1960 in respect of the Mazzonis. [7] Items discussed affect both the Runzos and the Mazzonis unless otherwise indicated. We proceed to a consideration of the items open to dispute. 1. Insurance. Petitioners' *387 net worth computations reflect the amount, ultimately received as proceeds from the surrender of life insurance, as an asset not only in the year of receipt but also as an asset in the same amount for each preceding year. Respondent, by way of contrast, treats the amounts received only as an asset in the year of surrender with an offsetting below the line adjustment to reflect the receipt of nontaxable income. The record is utterly devoid of any evidence as to the cash value of any of the policies in any of the years preceding the year of surrender. There is no basis whatsoever for equating the ultimate amount received on surrender with such cash value. Indeed, it is common knowledge that the cash surrender value of a life insurance policy differs in amount from one year to the next, usually in an increasing progression. In the absence of any proof to the contrary, we uphold respondent's handling of this item. 2. Ragliani Building. Petitioners on brief argue for additional depreciation for the Ragliani Building in the amount of $300 per year. The cost of the building has been stipulated at $9,250 and respondent has computed depreciation on the basis of a 30-year useful life as used *388 by the petitioners on their tax returns. Petitioners have presented no evidence to controvert the stipulated cost nor the useful life of the structure which they themselves adopted. Accordingly, we sustain respondent's computation of depreciation for the Ragliani Building. 3. Bowling Alley (Runzos). Respondent has conceded that this item was inadvertently omitted from the net worth computation and he has accepted petitioners' computations with the exception that he has deducted a 10 percent salvage value. Petitioners having submitted no evidence as to that value, respondent's computations are sustained. 4. Imputed cash. In the years 1958, 1961, and 1962 with respect to the Runzos and the years 1961 and 1962 with respect to the Mazzonis respondent has added personal cash on hand in an amount equal to the amount by which the determination of income based on the net worth computation before such addition of cash is less than the adjusted gross income reported on petitioners' returns for those years. Petitioners' objection to this treatment was primarily directed to their indictment of respondent's methodology in an attempt to demonstrate that respondent's net worth computations were *389 unworthy of belief. Our conclusions as to the essential integrity of those computations have previously been discussed. See pp. 34-36, supra. Respondent has now abandoned his claims for deficiencies with respect to the years and petitioners as indicated when personal cash on hand was thus imputed. Consequently, such action can have significance only with respect to the increase of net worth between those years and the immediately subsequent years. The effect of not imputing such cash would be to reduce the net worth for the earlier year, producing a larger increase in net worth for the subsequent year and consequently resulting in a greater amount of unreported income and a greater deficiency than 122 respondent has claimed. This would be the consequence with respect to 1959 and 1963 with respect to the Runzos, years which the respondent has not conceded, and with respect to 1962 for the Runzos, a year which the respondent has conceded. Consequently, adoption of respondent's calculation can have no adverse effect on the tax liabilities of the petitioners involved herein and we see no purpose to be served by discussing the matter. We are constrained to note, however, that, since *390 the years of visible acquisitions of assets do not always correspond with the receipt of income, a decrease in net worth as against reported income can readily result and the current accumulation of cash may be the most plausible explanation. 5. Auto depreciation (Runzos). The Runzos contend that they should be allowed a $600 per year depreciation allowance for their automobile for 1958 and later years. We have no evidence as to whether this auto was used for personal or business purposes or both. Accordingly, we must hold that petitioners have failed to sustain their burden of proof and respondent's treatment is approved. 6. Depreciation Schcdules. Included in this category are various items dealing with equipment and buildings utilized in connection with the Blairsville and Homer City stores and the Coffee House Hotel. Respondent's calculations as to cost, useful life, and salvage value are, as far as we can determine, mathematically correct. Having no evidence upon which we can base a contrary determination, we must uphold respondent's determinations based upon petitioners' failure of proof. 7. Transferred Lot (Mazzonis). Petitioners claim that a lot transferred by the Mazzonis *391 to their son, Edward, in 1958 should be valued at $987. Respondent contends that the proper value is that stipulated by the parties, $937.50. We sustain respondent. 8. $1,270 item (Mazzonis). This involves a dispute with respect to whether the item should be a 1961 or 1962 adjustment. Since respondent has abandoned any claim for deficiencies against the Mazzonis for both these years, the issue is moot. 9. U.S. Government Bonds (Mazzonis). Our findings of fact reflect our conclusion that the Mazzonis acquired an additional $3,000 worth of Government bonds in 1957, bringing their total holdings to $28,000. We based this conclusion upon the fact that interest with respect to an additional $3,000 worth of bonds was first reported in 1957 and the fact that the Mazzonis' $25,000 in bonds and the Runzos' $41,000 bore consecutive serial numbers, while the numbers of the remaining Mazzoni bonds are not part of this series, suggesting that they were acquired at a different time. 10. Dean's Restaurant (Mazzonis). Petitioners object to respondent's failure to establish a depreciation reserve with respect to a building which allegedly housed the so-called Dean's Diner or Dean's Restaurant *392 which the Mazzonis acquired in 1960. The consideration was $15,000 and respondent has allocated $5,500 to equipment, on which he has allowed depreciation. On this record we can find no error in respondent's refusal to establish a depreciation reserve for the building. We have been given no information from which we could make an allocation between land and building, and there is no indication from the Mazzonis' tax returns that Dean's Restaurant was operated. It is entirely possible on this record that the diner was demolished to make additional parking space for the Coffee House Hotel (to which the equipment may well have been moved) and that the consideration should properly be applicable to the land, as respondent has, in fact, treated it. 11. Dean Party Room Building Depreciation (Mazzonis). This appears to have been a building separate from Dean's Restaurant. Only the year 1962, which is no longer at issue, is involved and, in any event, respondent has conceded the item. 12. Additional Investment in Coffee House Hotel (Mazzonis). Respondent determined that the Mazzonis made an additional investment in the Coffee House Hotel in 1959 in the amount of $8,791.29, which was the *393 net amount of cash outflow on account of the Coffee House in 1959. The Coffee House Hotel reported a loss on its 1959 tax return of $10,533.65, and respondent computed the aforementioned figure of $8,791.29 by eliminating noncash items such as depreciation. The tax return reflects opening and closing cash balances for the year of zero and $522.20, respectively. The only other assets shown on the return were inventory and assets contributed in kind by the Mazzonis, i.e., hotel equipment and 123 parking lot paving. Thus, the hotel corporation had no capital account to absorb the cash loss. We note that no separate checking account was maintained for the Coffee House. We have no evidence of Mazzoni cancelled personal checks for 1959, but analysis of such checks for 1961 and 1962 reflects substantial expenditures on behalf of the hotel, and we think it reasonable to infer that this pattern existed in 1959 and that the loss was covered by payments from the Mazzonis' personal accounts. Accordingly, we approve respondent's determination as to this issue. 13. Payments to Kaufman's (Runzos). We have determined in our findings of fact that $635.22 paid by the Runzos in 1960 was part of *394 the Runzo personal living costs. To be sure, Kaufman's representative, who was respondent's witness at the trial, testified that only $372 was paid in that year and, in addition, respondent has failed to comply with the Court's directive so as to justify use of the agent's memorandum of information taken from Kaufman's records. But the Runzos' cancelled checks, which were the subject of a post-trial stipulation, show payments in the larger amount. The stipulation did not include the purpose of the payments covered by these checks but petitioners have offered no evidence that the amounts were not paid on behalf of the Runzo account or did not represent personal living costs. Since, for the purpose of the underlying deficiencies, the petitioners have the burden of proof, we sustain the larger figure of $635.22. Petitioners object to respondent's determination of other personal expenditures for the Runzos for each of the years in question. There are two facets to this controversy, the first concerning personal expenses paid by check, the second concerning estimates of cash payments for food of $1,200 and miscellaneous personal items of $2,000 per year. Petitioners have refused to stipulate *395 to the correctness of respondent's analysis of the purpose of personal checks, but they have not presented any evidence on this score nor have they made a motion, which the Court indicated it would look favorably upon, to reopen the record for additional evidence concerning these items. Accordingly, we sustain respondent's determinations. We find respondent's estimates of cash expenditures of $1,200 per year for food entirely reasonable, but think that his estimate of $2,000 per year for other additional personal expenditures, beyond those covered by checks, is too high. The Runzos appear at all times to have had frugal living habits. Moreover, we have sustained sizeable amounts of personal expenditures, which were represented by checks. Under all the circumstances, we have concluded, as our findings of fact show, that the Runzos incurred $1,000 in living costs not represented by checks and not including food expenses. One final matter. With respect to the year 1959 with respect to the Mazzonis, respondent on brief has asserted an increased amount of unreported income over that claimed in the notice of deficiency and presumably an increased deficiency, although we have not been *396 favored with any calculation thereof. Respondent's pleadings seek only the amount set forth in the deficiency notice. No attempt has been made to amend those pleadings to reflect any increased claim. Accordingly, to the extent that our conclusions herein should result in a larger deficiency than the amount claimed by the deficiency notice for the year specified (or for that matter for any other year), the latter amount shall be the measure of petitioners' liability. Timely Filing of Returns Respondent determined that the addition to tax for fraud attached to the entire tax liability, instead of the amount of the underpayment for 1956 with respect to the Runzos and 1956 and 1959 with respect to the Mazzonis on the ground that the returns for those years were not timely filed. Section 6653(c)(1). [8] Since we have held that no addition to tax for fraud should be imposed on the Runzos for 1959 and that, with respect to the Mazzonis for the year 1956, it is barred, this issue is now involved only with respect to the Mazzonis for 1959. 124 The return was filed on April 29, 1960, which was clearly beyond the time required by the statute, [9] and respondent's determination is sustained. *397 See Cirillo v. Commissioner, 314 F. 2d 478, 484 (C.A. 3, 1963), affirming as to this issue a Memorandum Opinion of this Court. *398 In order to reflect our conclusions herein and the various concessions of the parties, Decisions will be entered under Rule 50. Footnotes
1. Petitioner Josephine Mazzoni died on February 10, 1969.↩
*. Amount is limited to $13,978.49 as set forth in the deficiency notice. See p. 72, infra.↩
2. Charles Runzo received no salary for operating the Homer City store, while Josephine and Peter Mazzoni received modest salaries for their roles in the Blairsville store. ↩
3. We note that there is no evidence that costs of goods sold were overstated.↩
4. We emphasize that our above conclusions deal only with the amount and expenditure of cash on hand at the beginning of the period in issue. As our findings of fact show, the Runzos had additional personal cash on hand at the end of certain of the years in issue. We attribute such cash to reaccumulations in 1958 and later years.↩
5. The record herein does not reveal whether in fact such correlation existed in whole or only in part.↩
6. As a consequence, we have found it unnecessary to consider the extent, if any, to which the clear and convicing standard of proof necessarily attaches in all cases, for the purposes of determining fraud, to the critical elements of the net worth computation, such as the likely source of unreported income or the existence and use of a cash hoard, as well as to the fraud itself.↩
7. Since we have found fraud with respect to the Runzos for the years 1956 and 1957 and with respect to the Mazzonis for the year 1957, there is no need for us to consider the effectiveness of petitioners' consents to extend the period of limitations insofar as these years are concerned. We have already held that the assertion of any deficiency with respect to the Mazzonis for 1956 is barred by the period of limitations. Petitioners make no contention that any of the other years, with respect to which deficiencies are claimed, are barred.↩
8. SEC. 6653. FAILURE TO PAY TAX. * * * (c) Definition of Underpayment. - For purposes of this section, the term "underpayment" means - (1) Income, Estate, and Gift Taxes. - In the case of a tax to which section 6211 (relating to income, estate, and gift taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing), and * * * ↩
9. The date of mailing, rather than receipt, provision was not enacted into law until 1966 (P.L. 89-713, 80 Stat. 1107 (Nov. 2, 1966)) and was not made retroactive. Moreover, although no evidence was presented, it seems highly unlikely that the return could have been timely, since the last date for mailing was April 15, 1960, two weeks before the date of receipt of the return.↩