BRUNO V. BARBUTO, JR. AND GERALDINE BARBUTO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barbuto v. Commissioner
Docket No. 18227-88
United States Tax Court
T.C. Memo 1991-342; 1991 Tax Ct. Memo LEXIS 391; 62 T.C.M. (CCH) 238; T.C.M. (RIA) 91342; July 25, 1991, Filed *391 Decision will be entered under Rule 155. Robert H. Williams, Ronald M. Warren, and Arthur A. DiPadova, for the petitioners. Russell K. Stewart and Ruth M. Spadaro, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACTS AND OPINION Petitioners filed joint returns for 1979 through 1983. Respondent determined that petitioners fraudulently failed to report petitioner Bruno Barbuto, Jr.'s illegal drug-related income during those years. We sustain the fraud determination against petitioner Bruno V. Barbuto, Jr., but not against petitioner Geraldine Barbuto. Petitioner Geraldine Barbuto seeks relief as an innocent spouse under section 6013(e) or on grounds of duress and coercion. We hold she is not entitled to relief from joint liability for tax on those grounds. Respondent determined deficiencies and additions to tax as follows: Additions To Tax
Year
Deficiency
[1] Sec. 6653(b)(1) Sec. 6653(b)(2)
Sec. 6661
1979
$ 18,689.43
$ 9,344.72  1980
44,920.67
22,460.34
1981
10,105.22
5,052.61
1982
11,591.40
5,795.70 *
$ 2,897.85
1983
5,713.95
2,856.98 **
1,428.46
*392 The issues for decision are: 1. Whether the deficiencies determined by respondent which are based on petitioners' unreported income during taxable years 1979 through 1983 are correct. We hold that they are. 2. Whether respondent violated the "leads doctrine." We hold that it was not violated. 3. Whether petitioner Bruno Barbuto, Jr., is liable for the addition to tax for fraud under section 6653(b) for taxable years 1979 through 1983. We hold that he is. 4. Whether petitioner Geraldine Barbuto is liable for the addition to tax for fraud under section 6653(b) for taxable years 1979 through 1983. We hold that she is not. 5. Whether petitioners are liable for additions to tax for substantial understatement of income tax under section 6661 for 1982 and 1983. We hold that they are. 6. Whether petitioner Geraldine Barbuto is not jointly liable for tax on the grounds that she is eligible for treatment as an innocent spouse under section 6013(e) for 1979 and 1980, or on grounds of duress and coercion. We hold that she is not. References to petitioner in the singular are to Bruno V. Barbuto, Jr. References to Mrs. Barbuto are to petitioner Geraldine Barbuto. All section *393 references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT 1. Petitioners
Petitioners Bruno V. Barbuto, Jr., and Geraldine Barbuto are husband and wife who resided in Sewell, New Jersey, when they filed their petition. They were married in 1962. Petitioners have two children, Michael and Renee. Michael was 15 and Renee was 7 years old in 1979. Michael and Renee lived with their parents during the years at issue. Petitioner was employed as a millwright by the Budd Company in Philadelphia, Pennsylvania, where he earned $ 12,487.48 in 1979, $ 12,708.18 in 1980, and $ 3,159.83 in 1981. He had been employed by the Budd Company for about 18 years. Petitioner is sometimes referred to as Bruno V. Barbuto without the "Jr." For example, the label on his income tax returns for 1979 through 1983 did not include "Jr." The 1979 label included pen and ink changes, but did not indicate "Jr." Other examples of documents that did not include "Jr." are: Mr. Dinerman's September 10, 1979, letter, the pool construction contract and invoices; irrigation *394 system contract; sprinkler system invoices; basement waterproofing contract; appliance contracts; alarm statements; 1966 Corvette sale document; Sharper Image computer records; and furniture and carpeting invoices. Petitioner stopped working at the Budd Company in 1980. He then started his own painting and wallpaper business. He did not advertise his business or list it in the telephone book. Instead, he used his family telephone. He stored some painting equipment but no wallpaper or wallpapering equipment in his residence. Mrs. Barbuto was a housewife during the years at issue. She attended school through the 12th grade. She married petitioner in 1962. She was not employed outside the home between 1965 and the years at issue. Her work experience includes clerical work such as typing, filing, and operating a bookkeeper's machine to do posting. She has taken no accounting courses. Petitioner's father was Bruno V. Barbuto, Sr. (hereinafter Mr. Barbuto, Sr., or petitioner's father). During 1979 and 1980, petitioner's father was retired and petitioner's mother was a housewife. Their Federal income tax returns indicate that they received pension payments of $ 7,279 in 1979 *395 and $ 4,087 in 1980, and interest income of $ 343 in 1979 and $ 344 in 1980. Their income tax returns listed Mr. Barbuto, Sr., as retired, however, a loan application made by petitioner's father in 1979 lists him as employed as a part-time plumber. Petitioner's father did not report any wages on his 1979 income tax return. On January 22, 1977, petitioner's father borrowed $ 5,638 from the Navy Federal Credit Union to purchase a 1977 Cadillac Coupe De Ville. In March 1979, he borrowed $ 8,140.36 from the Navy Federal Credit Union to purchase a 1979 Cadillac Coupe De Ville. In January 1977, Mr. Barbuto, Sr.'s total savings were $ 7,648.45. In March 1979 his total savings were $ 2,240.33. Petitioner's father died on September 19, 1980. 2. Petitioner's Drug Involvement
In 1979 or 1980 petitioner began to sell, manufacture, and distribute illegal drugs. He earned substantial amounts of income from the sale and distribution of illegal drugs. He did not maintain any books or records for his drug business. In 1980 petitioner's behavior began to change drastically. He disappeared for weeks before returning. These changes resulted in part from petitioner's drug use. Petitioner *396 used drugs every day. It is not clear when he began to use drugs. Petitioner's drug use had a profound effect on his family. He displayed violent behavior towards his family at times. Petitioner broke windows and threw dishes. He also was sometimes violent towards his children, used abusive language, and threatened his wife with physical violence. He attempted to conceal information concerning his activities from his wife and family, such as his illegal drug activity and many purchases that he made. In late 1980, Mrs. Barbuto realized she needed help dealing with petitioner's drug problem. She contacted a drug addiction counselor by the name of Thomas Murgitroyde, who worked at the Valley Forge Medical Center. Mrs. Barbuto learned of Mr. Murgitroyde through her brother-in-law who knew of him through the United Way and the AFL-CIO. Petitioner was not aware of his wife's initial contact with Mr. Murgitroyde. After several discussions with Mr. Murgitroyde, Mrs. Barbuto told petitioner that she had contacted Mr. Murgitroyde. That made petitioner angry. Mr. Murgitroyde recommended at least two drug and alcohol rehabilitation centers to Mrs. Barbuto. Mrs. Barbuto took care *397 of petitioner when he became physically sick from taking drugs. Mrs. Barbuto remained married to petitioner during the years at issue. Sometime in 1981 Mrs. Barbuto witnessed petitioner taking drugs. In April 1985, petitioners' son, Michael Barbuto, was indicted for conspiring with several other people, including both petitioners, to distribute controlled dangerous substances. Michael Barbuto pleaded guilty to conspiracy to distribute controlled dangerous substances. Mrs. Barbuto pleaded guilty to at least one drug-related charge and received 6 months probation. On April 9, 1987, petitioners were indicted by a Federal Grand Jury for income tax evasion for taxable years 1980 through 1983. The charges against Mrs. Barbuto were dismissed. Petitioner pleaded guilty to violations of section 7201 for 1980 and 1982. Petitioner pleaded guilty to filing a fraudulent return for 1980 reporting income of $ 17,764 when he knew his taxable income was approximately $ 96,974. For 1982, petitioner pleaded guilty to filing a fraudulent return reporting income of $ 13,556 when he knew his taxable income was approximately $ 47,745. 2. Family Finances
Funds for many family purchases *398 came from the sale of illegal drugs. Mrs. Barbuto was responsible for paying the family's household bills, including the mortgage and utilities. Each week petitioner gave Mrs. Barbuto cash to pay the bills. When petitioner was away from his residence for over a week, he sent cash to Mrs. Barbuto to pay the bills and for general living expenses. During the years at issue petitioners maintained bank accounts as shown below. The account balances changed as shown during each of the years at issue. Decreases are shown in brackets. Changes in Petitioner's Bank Balances
Increases (Decreases) Bank
Account No.
1979
1980
1981
1982
Princeton
Bank  024-498-8
479.71 $ (1,133.53)
Princeton
Bank  38-7617-1
297.42 338.27 Princeton
Bank  165-4410285
100.47 1,350.47 260.00 (1,638.70)
Princeton
Bank  165-4410829
17,937.05 1,012.00 (15,741.84)
Princeton
Bank  165-4410272
100.47 1,739.20 270.00 402.10 Princeton
Bank  CD #401804
20,000.00 Princeton
Bank  CD #404659
10,000.00 Princeton
Bank  CD #406859
19,000.00 Philadelphia
Nat'l Bank
1511-9362
80.74 (415.22)
Philadelphia
Nat'l Bank
600-5996
(261.24)
(1,530.30)
Philadelphia
Nat'l Bank
5680-0146
276.75 (1,184.19)
Philadelphia
Nat'l Bank
5680-2152
253.28 (826.24)
Budd Co.
Credit Union
425.52 405.20 251.76 172.74 Net Annual Increase:
$ 975.99 $ 17,955.68 $ 20,957.65 $ 12,532.57 *399 Changes in Petitioner's
Bank Balances
Increases (Decreases)
Bank
1983
Princeton
Bank  Princeton
Bank  (128.63)
Princeton
Bank  103.37 Princeton
Bank  (2,312.13)
Princeton
Bank  465.82 Princeton
Bank  20,000.00 Princeton
Bank  Princeton
Bank  Philadelphia
Nat'l Bank
Philadelphia
Nat'l Bank
Philadelphia
Nat'l Bank
Philadelphia
Nat'l Bank
Budd Co.
Credit Union
(2,535.39)
Net Annual Increase:
$ 15,593.04 Petitioner was the sole wage earner in his family during the years at issue. In September 1979, petitioner approached a longtime friend, Larry Dinerman, and asked him to hold $ 45,000 for him. Petitioner told Mr. Dinerman that petitioner's father gave him the money. Petitioner did not want to deposit the money in his own bank accounts. Mr. Dinerman deposited the money into a bank account using the name Creditors Protective League. He gave petitioner a letter to a bank stating that he was giving them a gift of $ 50,000. There is no explanation for the difference between the $ 45,000 and $ 50,000 amounts. Mr. Dinerman returned the $ 45,000 to petitioner. 3. The Dorado Avenue House in Sewell
In 1979 petitioners purchased their home at *400 134 Dorado Avenue, Sewell, New Jersey, for $ 48,289.40 in cash and a $ 20,000 mortgage from the First Savings and Loan Association of Bayonne. Petitioners' mortgage application to First Savings and Loan Association of Bayonne listed assets valued at $ 84,294. Less than $ 4,000 of that amount was cash. Petitioner purchased carpeting and furniture for petitioners' home from Al Dieva Furniture & Carpeting costing $ 4,990 in 1979, $ 3,600 in 1981, and $ 3,400 in 1983. These purchases were made in cash. The 1979 purchase was for new wall-to-wall carpeting for their living room, dining room, hallways, stairs, master bedroom, and the three other bedrooms in their home. Both petitioners were involved in the selection of the carpeting. Mrs. Barbuto selected the carpet color. In 1980 petitioners sold their former residence at 7827 Buist Avenue in Philadelphia, Pennsylvania, for an adjusted selling price of $ 34,522. After paying off the mortgage, $ 14,938 was remitted to petitioners. In 1980 petitioner paid more than $ 12,500 in cash to construct an in-ground swimming pool at his home. He paid additional funds of $ 498 in 1980, $ 1,594 in 1981, $ 821 in 1982, and $ 1216 in 1983, *401 to repair, heat, and maintain the pool. Money for the swimming pool was obtained from petitioner's drug business. Mrs. Barbuto did not think that she and petitioner had enough money of their own to pay for the swimming pool. When she asked petitioner where the money came from, he said that it was a gift from his father. In 1982, petitioner had video surveillance cameras installed in his residence. From 1981 through 1983 petitioner contracted for redecorating his home. From 1980 through 1983 petitioners spent additional funds for landscaping, home and automobile improvements, and appliances. Petitioner spent $ 2,532 for solar heat in 1980. He also spent $ 5,100 in 1981 for a sprinkler system and well. He spent $ 4,450 for landscaping and patio covering in 1982. In 1983 he purchased appliances, landscaping, alarm systems, and basement waterproofing and improvement costing $ 5,565. In 1983 petitioner purchased a projection television and stereo system for $ 3,912 in cash. 4. The Automobiles
Petitioner purchased several automobiles during the years at issue. He paid cash for all of them. He had title to the cars taken in the name of various family members. In 1980 *402 petitioner bought a Buick Riviera for $ 11,808 from Allied Auto Sales. The automobile was titled in his sister's name, Marie Hudgeons. Petitioner stored the car at his residence most of the time, and both petitioners used the car. Petitioner used it more often than Mrs. Barbuto. Also in 1980, petitioner bought a 1966 Chevrolet Corvette for $ 14,525. The cash was obtained partly from petitioner's drug business. Petitioner attempted to conceal this car from his wife. Mrs. Barbuto was not with petitioner when the Corvette was purchased. Petitioner kept the car at the home of a friend of petitioner's. Mrs. Barbuto eventually learned about the purchase, but it is not clear when. She wrote the checks for the car insurance. The insurance papers listed the Corvette and the Datsun 280Z described below. Petitioner bought a 1979 Cadillac for $ 15,000 and had it titled in his brother Salvatore's name. The date of purchase is not in the record. In 1980 petitioner purchased a 1980 Datsun 280ZX for $ 14,158 plus sales tax. Petitioner kept this car in his mother's garage. On August 20, 1980, petitioner purchased a 1980 Mercedes Benz automobile for $ 27,860 from Delaware Valley Auto *403 Sales. The purchase order and receipt did not reflect a "Jr." or "Sr." with the name Bruno V. Barbuto. Petitioner paid $ 18,790 in cash. The balance of $ 9,070 was paid by trade-in of a 1979 Cadillac. Petitioner's father had the Mercedes Benz for one month until he died. Petitioner took possession of the Mercedes Benz after his father died. In 1981 Mrs. Barbuto acquired a 1978 Pontiac Firebird for $ 6,545. She signed the title. Petitioner ordered and paid for the Firebird. It was later given to Michael. On or about September 23, 1983, petitioner bought a 1984 Ford, Bronco II for $ 14,157.50 in cash. The sales price includes sales tax of $ 605 and tags of $ 52.50. Title was recorded in Mrs. Barbuto's name on September 26, 1983. She signed the title registration. Part of the cash was obtained from petitioner's drug business. 5. The Communications and Electronic Equipment
Petitioner purchased sophisticated communications equipment and related electrical services from 1980 through 1983. He paid $ 9,440 in 1980, $ 5,209 in 1981, $ 2,656 in 1982, and $ 11,912 in 1983 for the equipment. Petitioner generally paid for these purchases and related services in cash. *404 Petitioner also bought a radio telephone and related services for $ 3,152 in 1981. 6. Personal and Sundry Items, Vacations, and Other Expenses
Petitioner gave Mrs. Barbuto a necklace and a bracelet as Christmas and birthday gifts. Petitioner or Mrs. Barbuto ordered personal catalog or department store or sundry items from stores such as John Wanamaker, and the Sharper Image in the amounts of $ 305, $ 3,270, $ 442.00, and $ 5,969, in 1980 through 1983, respectively. Petitioner also purchased burial crypts for $ 6,740 in 1980, paying $ 3,977 in 1980 and $ 2,763 in 1981. In 1982 Mrs. Barbuto bought a silver fox fur jacket for $ 3,150 in cash. To purchase jewelry, petitioner spent at least $ 2,875, $ 1,550, $ 1,850, $ 2,400, and $ 1,900 from 1979 through 1983, respectively. In 1983 petitioner purchased a projection television and stereo system costing $ 3,912. In 1981 petitioners went on a vacation to St. Thomas, United States Virgin Islands. While there, purchases in the amount of $ 1,630.45 were made using petitioner's credit card. In 1981 petitioners went on a vacation to Aruba. While there, a purchase in the amount of $ 192.50 was made using petitioner's credit card. *405 On August 13, 1983, $ 789.60 of merchandise was purchased from the Gucci store in Atlantic City, New Jersey, using petitioner's credit card. On August 13, 1983, merchandise in the amount of $ 470 was purchased from the Talk of the Walk store in Atlantic City, New Jersey, using petitioner's credit card. Petitioners incurred utility expenses for electric, telephone and cable television in the total amounts of $ 2,416 in 1980, $ 3,307 in 1981, $ 3,635 in 1982, and $ 5,301 in 1983. In 1982 petitioners bought an interest in a time-share condominium in Kissimmee, Florida, for $ 4,400. Petitioners paid $ 3,946, $ 4,525, $ 3,914, $ 6,743, and $ 6,104 in taxes (not including sales tax), from 1979 through 1983, respectively. Petitioners paid automobile and life insurance premiums totaling at least $ 370, $ 2,151, $ 3,193, $ 4,361, and $ 4,412, in 1979 through 1983, respectively. Mrs. Barbuto wrote the checks to pay the premiums. 7. Tax Returns
Mrs. Barbuto was responsible for gathering information to submit to their accountant for preparation of petitioners' income tax returns. Petitioners filed joint income tax returns for 1979 through 1983. They did not maintain complete *406 and adequate books of account and records for the years at issue. Charles Turner, C.P.A., prepared their returns for the years at issue using information that petitioners furnished to him. The returns were false. In the notice of deficiency, respondent determined petitioners' income for the years at issue through the use of a source and application of funds method by contrasting reported income with expenditures for each year. The label on the 1979 return did not include a "Jr." or "Sr." with petitioner's name. However, the label included handwritten changes. OPINION 1. The Underlying Deficiency -- Source and Application of Funds Method
Petitioners did not maintain adequate books and records. Respondent used an indirect method to determine petitioners' unreported income for 1979 through 1983. The indirect method was a cash expenditures method also known as the source and application of funds method. Respondent compared petitioners' annual expenditures to their available resources. Excess expenditures over available resources were treated as income. United States v. Johnson, 319 U.S. 503, 87 L. Ed. 1546, 63 S. Ct. 1233 (1943); DeVenney v. Commissioner, 85 T.C. 927, 930 (1985); *407 Stanley v. Commissioner, 81 T.C. 634, 639 (1983). Petitioners bear the burden of proof as to the underlying deficiency. Rule 142(a). Petitioners do not dispute the validity of the source and application of funds method. On brief, petitioners argue that respondent's use of the source and application of funds method was flawed as to four specific purchases, and allege that the funds used to buy them were nontaxable gifts. The four items are their Sewell residence, the swimming pool, the fur jacket, and the time-share condominium in Florida. Petitioners also argue that respondent should not have charged them with the purchase of the Mercedes Benz as an application of funds in 1980. Petitioners stipulated before trial that they disputed only the source of funds to buy their home, the source of funds for the swimming pool, and the amounts expended by petitioners for catalog purchases. The parties have also stipulated to some minor adjustments to the source and expenditure figures determined by respondent. At trial, petitioners presented testimony to support their assertion that respondent improperly charged them for certain catalog purchases as an application *408 of funds. Mrs. Barbuto testified that friends gave her money to purchase items, which she then charged to petitioner's credit card. We do not believe her testimony on this issue. a. The Sewell Residence
In November 1979, petitioners purchased a home in Sewell, New Jersey, for $ 48,289.40 in cash and a $ 20,000 mortgage. Petitioners claim that petitioner's father gave them the funds to purchase the Sewell residence. We do not believe that explanation. Petitioner's father was an unlikely source of these funds. Petitioner's parents received pension income of $ 7,279 in 1979 and $ 4,087 in 1980. Petitioner's father's savings as indicated in automobile loan applications, were $ 7,648.45 in January 1977, and $ 2,240.33 in March 1979. During the years at issue, petitioner's parents earned less than $ 350 per year in interest income, according to their income tax returns. Petitioners argue that petitioner's father may have had nontaxable investments or a cash hoard. However, they did not produce any corroboration for this theory. We are not convinced that petitioner's father had a large cash hoard or significant nontaxable investments which were given to petitioners to buy *409 the house. Petitioners also argue that Larry B. Dinerman gave them a gift of $ 50,000. However, in September 1979, petitioner gave $ 45,000 to Mr. Dinerman to hold for petitioner. We believe that the purpose of channeling the funds through Mr. Dinerman was to conceal petitioner's $ 45,000. In light of the foregoing, we do not believe that funds for the house purchase came from either petitioner's parents or Mr. Dinerman. b. The Swimming Pool
As with the residence, petitioners contend that the source of funds to install the swimming pool at their home in 1980 was gifts from petitioner's father. The pool cost over $ 12,500. For the reasons discussed above, we do not believe that the source of these funds was gifts from petitioner's father. c. The Kissimmee Time-Share Unit
Petitioners argue that the source of $ 4,400 used to buy the Kissimmee condominium was a loan from someone named Rocky Rossi. Except for petitioner's testimony, there is no evidence of this purported loan. We are not persuaded that the loan existed. d. The Fur Jacket and Catalog Orders
Petitioners contend that the source of funds used to buy the fur jacket was a family gift cash hoard maintained *410 by Mrs. Barbuto. Mrs. Barbuto testified that she occasionally received cash Christmas and birthday gifts from members of her family in amounts of $ 50 to $ 100. She testified that over a 5-year period she saved the $ 3,150 that she used to purchase the fur jacket. She would have had to accumulate birthday and Christmas gifts averaging $ 630 per year to purchase the fur. Mrs. Barbuto testified that she placed catalog orders for many of her friends, for which they paid her in cash. This was her explanation for the source of funds for these catalog orders. Her explanation is uncorroborated. We are not convinced that this was the source of the funds. Petitioners note that her testimony was without direct contradiction. However, the explanations seem to be nothing more than convenient self-help. We do not believe her uncorroborated accounts. e. The Mercedes Benz
Petitioners assert that respondent should not have charged them with the purchase of the Mercedes Benz for $ 27,860 as an application of funds in 1980. Petitioners argue that petitioner's father paid and signed for the car, took possession of it, and then drove the car exclusively until his death. There is no *411 "Jr." or "Sr." on the Mercedes Benz documents. However, petitioner did not always use the "Jr." We are not convinced that petitioner's father had $ 18,790 in cash. The purchase order shows that a 1979 Cadillac was traded as part payment for the Mercedes Benz. The Cadillac may have been petitioner's father's car. However, for purposes of the source and applications method, if petitioner provided the cash for the purchase, as we have found, the source of the trade-in and ownership of the car is irrelevant. Accordingly, we find that respondent properly charged petitioners with the cash used to purchase the Mercedes Benz. 2. The Leads Doctrine
Petitioners argue that respondent violated the leads doctrine enunciated in Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954), in that respondent did not pursue leads provided by petitioners. Specifically, petitioners argue they provided respondent with leads that funds to purchase the Sewell residence and the pool came from petitioner's father, funds to purchase the Kissimmee time-share unit came from a loan from Rocky Rossi, and funds to buy Mrs. Barbuto's fur jacket came from cash gifts accumulated over 5 years. *412 We do not believe that petitioner's father was the source of these funds. Petitioners did not produce any corroboration of a claimed loan from Rocky Rossi to purchase the Florida condominium. An unsubstantiated allegation of an oral loan is not convincing to us. Mrs. Barbuto's family Christmas and birthday gift cash hoard theory also does not ring true. Respondent need not negate all of the possible sources of nontaxable income advanced by the taxpayers. Holland v. United States, supra at 138. Accordingly, we conclude that respondent did not violate the leads doctrine here. In light of the foregoing, we sustain respondent's determination of the underlying deficiencies. 3. Additions to Tax for Fraud
Respondent determined that a part of the underpayment of tax was attributable to fraud under section 6653(b) for 1979 through 1981 and section 6653(b)(1) and (2) for 1982 and 1983. The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Respondent has the burden of proving, by clear and convincing evidence, that some part of the underpayment of *413 tax was due to fraud. Sec. 7454(a); Rule 142(b). Where fraud is determined for more than one year, respondent's burden applies separately for each year. Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). a. Fraud by Petitioner
Petitioner is estopped from denying that his 1980 and 1982 tax returns are fraudulent because of his conviction of criminal tax evasion under section 7201. Amos v. Commissioner, 43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Petitioner concedes that he is collaterally estopped from denying fraud for 1980 and 1982. Thus we sustain respondent's fraud determination for petitioner for 1980 and 1982. Petitioner argues that respondent failed to prove fraud for the remaining years at issue. Courts have developed a number of objective indicators of fraud. Recklitis v. Commissioner, supra at 910. These include: (1) Understatement of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, (5) failure to cooperate *414 with tax authorities, (6) engaging in illegal activities, (7) attempting to conceal illegal activities, (8) dealing in cash, and (9) failing to make estimated tax payments. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo 1984-601. These badges of fraud generally exist in this case as to petitioner. Petitioners understated their income on their income tax returns, and stipulated that their returns for each of the years in issue were false. Fraud may be proven by circumstantial evidence, including the implausibility of the taxpayer's explanations, Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court, because direct evidence of the taxpayer's intent is rarely available. Bradford v. Commissioner, supra at 307; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). In 1979 petitioners reported total income of $ 12,670, of which $ 12,487 was wages, $ 147 was interest, and $ 36 was dividends. Also in 1979, petitioners paid $ 48,289.40 in cash for a *415 home. We do not believe that petitioner's father provided the funds for the house and swimming pool. The mortgage application for the Sewell home purchase showed assets valued at $ 84,294, less than $ 4,000 cash in the bank, and no cash on hand. Also in 1979, petitioner spent $ 4,999 for carpeting for his Sewell home, at least $ 2,875 for jewelry, $ 3,946 for taxes and $ 370 for insurance. In addition, the account balances in petitioner's bank accounts increased by $ 1,498.47. We conclude that the understatement of income was substantial and income was concealed with intent to evade taxes for 1979. The same pattern of understatement exists for 1980, 1981, 1982, and 1983. Repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income present a basis on which the Tax Court may properly infer fraud. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo 1985-148; Anderson v. Commissioner, 250 F.2d 242, 250 (5th Cir. 1957), affg. on this issue T.C. Memo 1956-178. Petitioner has inadequate records of his income. *416 His explanations are implausible. We are not convinced that the source of funds for the Sewell residence was petitioner's father or Mr. Dinerman. Petitioner concealed cars and jewelry. He engaged in illegal activity that he also attempted to conceal. Based on his expenditures in 1979 and lack of a credible explanation for the source of the funds, it appears that petitioner was involved in the sale or distribution of drugs by 1979. He repeatedly understated income to evade tax. He dealt in cash and did not make estimated tax payments. He did not provide his income tax preparer with information concerning all of his income. Petitioner's failure to fully inform his income tax preparer demonstrates fraudulent intent. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. Memo 1985-63. A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing intent to conceal, is strong evidence of fraud. Holland v. United States, 348 U.S. 121, 137-139, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), *417 affg. T.C. Memo 1970-37. We believe respondent has proven by clear and convincing evidence that petitioner is liable for the addition to tax for fraud under section 6653(b) for 1979, 1980, and 1981, and under section 6653(b)(1) and (2) for 1982 and 1983. We find all of the underpayment attributable to petitioner's fraud. In light of the foregoing, we sustain respondent's determination of additions to tax for fraud against petitioner under section 6653(b) for 1979 through 1981, and section 6653(b)(1) and (2) for 1982 and 1983. b. Fraud by Mrs. Barbuto
Fraud is not imputed from one spouse to another; in the case of a joint tax return, respondent must prove fraud as to each spouse charged with liability for the addition to tax. Sec. 6653(b)(3); Hicks Co. v. Commissioner, 56 T.C. 982, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972). The sophistication of the taxpayer is relevant to the determination of fraud. Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946). Fraud is the intentional commission of an act or acts for the specific purpose of evading a tax *418 believed to be owing. Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo 1966-81; McGee v. Commissioner, 61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967, 47 L. Ed. 2d 734, 96 S. Ct. 1463 (1976). Although she signed the joint returns containing the understatements of tax, the activities here that led to the fraud determination were those of petitioner, not Mrs. Barbuto. Accordingly, we conclude that respondent has not shown by clear and convincing evidence that Mrs. Barbuto intended to evade tax she believed to be owing. 4. Substantial Understatement of Income Tax
Respondent determined an addition to tax under section 6661 for 1982 and 1983. Section 6661 imposes an addition to tax when there is a substantial understatement of income tax in a taxable year. Sec. 6661(a). The addition to tax equals 25 percent of the amount of any underpayment attributable to the substantial understatement. Sec. 6661(a). A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $ 5,000. *419 Sec. 6661(b)(1). An understatement is the amount by which the amount required to be shown on the return exceeds the amount actually shown on the return. Sec. 6661(b)(2); Tweeddale v. Commissioner, 92 T.C. 501 (1989); Woods v. Commissioner, 91 T.C. 88 (1988). If the taxpayer has substantial authority for his or her treatment of any item on the return, the understatement is reduced by the amount attributable thereto. Sec. 6661(b)(2)(B)(i). Petitioners do not have substantial authority for the tax treatment of the items on their return. The understatement is reduced for any item adequately disclosed on the taxpayer's return. Sec. 6661(b)(2)(B)(ii). Petitioners did not disclose the omitted income. Thus, we find that petitioners are liable for the additions to tax under section 6661 for 1982 and 1983. The rate for the section 6661 addition to tax is 25 percent. Pallottini v. Commissioner, 90 T.C. 498 (1988). 5. Mrs. Barbuto's Liability
Petitioners assert two theories in support of their position that Mrs. Barbuto is not liable for the deficiencies or additions to tax. a. Duress or Coercion
Mrs. Barbuto *420 argues that she should not be liable for the deficiencies relating to 1981, 1982, and 1983 because she did not voluntarily sign those returns. To demonstrate duress, the disavowing spouse must prove (1) that he or she was unable to resist demands to sign the return, and (2) that he or she would not have signed the return but for the constraint applied to his or her will. Brown v. Commissioner, 51 T.C. 116, 119 (1968). The self-determination of the disavowing spouse is measured by a subjective standard. Furnish v. Commissioner, 262 F.2d 727, 733 (9th Cir. 1958), affg. in part and remanding in part Funk v. Commissioner, 29 T.C. 279 (1957). Petitioners point to their testimony as proof of Mrs. Barbuto's reluctance to sign the returns and fear of bodily harm if she did not do so. Mrs. Barbuto testified that she was unable to resist her husband's demand to sign the returns and that, but for his threats, she would not have signed the returns. Petitioner testified that he ran his house and that his wife listened to him. He said he would have threatened her physically if she did not obey him. The issue of duress is a question *421 of fact. Stanley v. Commissioner, 81 T.C. 634, 638 (1983). We are not persuaded by the testimony of petitioners. We believe petitioner's testimony at trial to be less than credible. We do not believe his assertions about his father's possible cash hoard or tax-free investments. Likewise, we do not believe his story about the loan from Rossi. His guilty pleas to tax fraud, involvement in illegal activity, and acknowledged attempts to conceal and misrepresent the truth to his wife also hurt his credibility. We are also mindful of his attempts to conceal assets by having others take title to automobiles. Mrs. Barbuto's credibility suffered from her claims that she purchased a fur with a cash hoard from family Christmas and birthday gifts to her, and her claim that she made catalog purchases for others. We are not persuaded that petitioner signed the joint income tax returns for 1981, 1982, and 1983 under duress. Accordingly, she is not relieved from liability under this theory. b. Innocent Spouse
Mrs. Barbuto also argues that she should be relieved from liability for the deficiencies for 1979 and 1980 because she qualifies as an innocent spouse under *422 section 6013(e). A husband and wife who make a joint return are jointly and severally liable for the tax due on their aggregate income. Sec. 6013(d)(3). However, section 6013(e) provides that a spouse may be relieved of joint and several liability in certain circumstances. To obtain relief under section 6013(e), the person asserting innocent spouse status must prove that: (1) Joint returns were made for each year in issue; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return; (3) the spouse desiring relief did not know, and had no reason to know, of such substantial understatement when signing the return; and (4) taking into account all facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency attributable to such substantial understatement. Sec. 6013(e)(1). A taxpayer must prove compliance with each of these provisions if there is to be any relaxation of the rule of joint and several liability upon filing a joint return. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Sonnenborn v. Commissioner, 57 T.C. 373, 381 (1971). *423 i. Joint Return
Petitioners filed a joint return. Thus, the first requirement is satisfied here. ii. Substantial Understatement Due to Grossly Erroneous Items
Mrs. Barbuto argued that the grossly erroneous items are solely attributable to petitioner, thus Mrs. Barbuto escapes liability. This analysis is incorrect under 6013(e). However, there is no other dispute that the joint return contained a substantial understatement of tax attributable to grossly erroneous items. Thus, the second requirement is met. iii. Knowledge of the Understatement
Mrs. Barbuto must prove that she did not have knowledge or reason to know of a substantial understatement. Sec. 6013(e)(1)(C). This depends on whether, at the time of signing the returns, a reasonable person in taxpayer's circumstances (e.g., intelligence, emotional state, level of involvement in the financial transactions giving rise to the income, complexity of such transactions, lavish or unusual expenditures, etc.) could have been expected to know of the substantial understatements. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo 1988-63; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), *424 affg. on this issue T.C. Memo 1984-310; Sanders v. United States, 509 F.2d 162, 166-168 (5th Cir. 1975). One factor in determining whether a spouse had reason to know of a substantial understatement of tax is the presence of unusual or lavish expenditures. Mysse v. Commissioner, 57 T.C. 680, 699 (1972). An increase in a couple's general standard of living may put a spouse on notice of unreported income. Flynn v. Commissioner, 93 T.C. 355, 366 (1989); Mysse v. Commissioner, supra at 698-699. With regard to the knowledge element, petitioners argue that once Mrs. Barbuto overcomes respondent's presumed correct determination by presenting competent and relevant credible evidence to establish that respondent's determination was erroneous, respondent has the burden of going forward with evidence, citing Baird v. Commissioner, 438 F.2d 490, 493 (3d Cir. 1970). They then argue that her uncontradicted testimony is sufficient to establish that respondent's determination with regard to the knowledge element is erroneous, citing Demkowicz v. Commissioner, 551 F.2d 929, 932 (3d Cir. 1977). *425 In her testimony, Mrs. Barbuto indicated that in 1981 she knew that they were spending more than the amounts they reported as income. She did not indicate when she first noticed this fact. However, we believe that she knew of this fact at least two years earlier. In 1979, petitioners spent $ 48,289.40 cash to purchase a house. Mrs. Barbuto testified that she believed the source of funds was a gift from petitioner's father. We believe that she knew petitioner's parents were unlikely to provide such a large gift. She knew about the expenditures for the swimming pool, interior decorating, landscaping, and the solar additions to their home. Petitioner may have been able to conceal his purchase of some cars he bought, but not all of them. We also note that her claim is based in large part on her testimony which we found to be less than credible. Accordingly, we hold that Mrs. Barbuto fails the third requirement. iv. Inequitable to Hold the Spouse Liable
We also hold that she fails the fourth requirement. The fourth requirement is that Mrs. Barbuto must prove that it is inequitable to hold her liable for the deficiency in tax. Sec. 6013(e)(1)(D). One factor in deciding *426 whether it is inequitable to hold a spouse liable for a deficiency, is whether the purported innocent spouse significantly benefited, either directly or indirectly, from the items omitted from gross income. Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 242 (1986), affd. 826 F.2d 470 (6th Cir. 1987); H. Rept. 98-432 (Part 2) 1501, 1502 (1984); sec. 1.6013-5(b), Income Tax Regs.
Normal support is not a significant benefit for purposes of determining whether it is inequitable to hold petitioner liable for the deficiency. Sec. 1.6013-5(b), Income Tax Regs.; Flynn v. Commissioner, supra at 367; Terzian v. Commissioner, 72 T.C. 1164 (1979); Hayes v. Commissioner, supra. Normal support is determined by the circumstances of the parties. Sanders v. United States, supra at 168; Flynn v. Commissioner, supra at 367; Estate of Krock v. Commissioner, 93 T.C. 672-678 (1989). "Unusual support or transfers of property to the spouse would, however, constitute 'benefit' and should be *427 taken into consideration" even when the benefit was received "several years after the year in which the omitted item should have been included in gross income." S. Rept. 91-1537 (1970), 1971-1 C.B. 606, 607-608; Estate of Krock v. Commissioner, supra at 679. Here, Mrs. Barbuto derived significant benefit from the understatement in many ways, including a new home, new furnishings and carpeting, a new swimming pool, solar system, landscaping, and interior decorating. Accordingly, we hold that Mrs. Barbuto fails to meet the fourth requirement. In light of the foregoing, Mrs. Barbuto is not entitled to treatment as an innocent spouse under section 6013(e) for 1979 or 1980. To reflect concessions by respondent and the foregoing, Decision will be entered under Rule 155. Footnotes
1. Section 6653(b)(1) was not in effect before 1982. Therefore, we treat respondent's fraud allegation as set forth in the answer under section 6653(b) for 1979 through 1981, rather than under 6653(b)(1) for 1979 through 1983 as set forth in the notice of deficiency. * 50 percent of the interest due on $ 11,591.40 ** 50 percent of the interest due on $ 5,713.95↩