T.C. Memo. 1997-425


UNITED STATES TAX COURT


DAVID W. HILL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20815-95.                    Filed September 22, 1997.


<u>Glen A. Stankee</u>, for petitioner.

<u>William B. McCarthy</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income taxes and fraud penalties as follows:

| Year | Deficiency | Penalty Sec. 6663(a) |
|------|------------|----------------------|
| 1989 | ($953.00)  | $33,753.00 |
| 1990 | (241.00)   | 16,511.25 |
| 1991 | 2,640.83   | 44,903.12 |

After concessions, the only issue for decision is whether petitioner is liable for penalties for fraud under section 6663(a)[1] for the taxable years 1989, 1990, and 1991.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference. Petitioner resided in Panama City, Florida, at the time he filed his petition. During all the years in issue, petitioner was married to, and filed joint Federal income tax returns with, Janice D. Hill.

During the years in issue, petitioner was employed by Bay Point Yacht and Country Club, Inc. (Bay Point, Inc.), as the director of property operations. The property operations department of Bay Point, Inc., through its own employees and various subcontractors, performed repair, maintenance, and landscaping work, as well as light construction at Bay Point Yacht and Country Club.[2] The property operations department

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Bay Point Yacht and Country Club is a 1,100-acre planned unit development located in Panama City, Florida. Bay Point Yacht and Country Club, Inc., served as the developer of Bay Point Yacht and Country Club and continues to own and operate some of its ongoing businesses, such as its golf business, its maintenance and landscaping business, and its marina.

operated with an annual budget between $1.2 million and $1.6 million.  In his capacity as director of property operations, petitioner oversaw the entire operation of the department and supervised as many as 70 employees, as well as a number of subcontractors.  These subcontractors performed various tasks at Bay Point Yacht and Country Club that could not be performed by employees of Bay Point, Inc.  One of petitioner's duties as director of property operations was to determine whether his own employees could perform a specific task.  If petitioner found that his own employees could not perform the job, he would then retain a subcontractor on behalf of Bay Point, Inc., to complete the work.

James Hall was a subcontractor retained by petitioner on behalf of Bay Point, Inc.  During the years in issue, Mr. Hall made a series of cash payments to petitioner in the following amounts:  $142,377 in 1989; $76,450 in 1990; and $180,609 in 1991.  Petitioner received cash payments from Mr. Hall approximately every other week.  Petitioner did not report any of the payments from Mr. Hall on his original Federal income tax returns filed for the taxable years 1989, 1990, and 1991.

On June 8, 1992, following an internal investigation of petitioner's department, the president of Bay Point, Inc., William F. Spann, requested and received petitioner's resignation.

In addition to his employment with Bay Point, Inc., petitioner operated a construction consulting business as a sole proprietorship. In the conduct of his own business, petitioner utilized the services of various subcontractors. Petitioner maintained records showing the individual payments made to these subcontractors throughout the year. Petitioner compiled these individual payments and timely provided each subcontractor with a requisite Form 1099 reflecting the sum of the payments.

During the taxable years 1989, 1990, and 1991, petitioner was also a shareholder of an S corporation known as Aquamar Production Research Corp. (Aquamar). Petitioner's interest in Aquamar ranged from 13 to 14 percent. In 1990 and 1991, petitioner was a general partner in a real estate partnership known as Skyview Development. Petitioner had a 33.33-percent profits and loss interest in Skyview Development. In addition, petitioner and his wife also owned various rental properties during the years in issue.

On or before April 15 of each of the taxable years in issue, petitioner filed an Application for Automatic Extension of Time to File U.S. Individual Income Tax Return (Form 4868). Petitioner timely filed his 1989, 1990, and 1991 Federal income tax returns on or about August 14, 1990, August 15, 1991, and August 15, 1992, respectively.

Petitioner's returns for the taxable years 1989, 1990, and 1991 were prepared by Fred Pressley.[3]  Mr. Pressley prepared petitioner's returns based upon documentation supplied to him by petitioner.  The records maintained by petitioner included the Forms 1099 referred to above, rental income and expense records, and records pertaining to the operations of his consulting company.  Petitioner provided Mr. Pressley with documentation for expense items in amounts as small as $3.26.  Petitioner also provided Mr. Pressley with Partner's Share of Income, Credits, Deductions, Etc. (Schedule K-1's) from Aquamar and Skyview Development.

During the preparation of petitioner's 1989 tax return, petitioner informed Mr. Pressley that he had received income from Mr. Hall, but had not received a Form 1099 from Mr. Hall. Petitioner did not give Mr. Pressley information regarding the amount of income he had received from Mr. Hall.  Mr. Pressley initially advised petitioner to obtain a Form 1099 from Mr. Hall; however, petitioner informed Mr. Pressley that he would not be able to obtain the Form 1099 by the due date of the return.  Mr. Pressley then advised petitioner that it would be appropriate to estimate the amount of the income, report that estimate on the

---

[3]Mr. Pressley's work experience is primarily in hotel management and the laundry and dry cleaning services.  In 1978, Mr. Pressley was employed by H & R Block as a seasonal tax return preparer.  Mr. Pressley operated his own tax service from 1980 until 1987.  He continued to prepare income tax returns on a part-time basis until 1993.

return, and subsequently amend the return upon receipt of the correct information. Petitioner instructed Mr. Pressley that he would rather file his return for 1989 based on the documentation that he had at that time. Petitioner's 1989 Federal income tax return did not reflect any income received from Mr. Hall.

During the preparation of petitioner's 1990 tax return, Mr. Pressley again urged petitioner to obtain the information from Mr. Hall, or, in the alternative, to estimate the amount of money received from Mr. Hall. Petitioner's 1990 Federal income tax return did not reflect any income from Mr. Hall. Similarly, petitioner's 1991 Federal income tax return did not reflect any income he received from Mr. Hall.

In October 1992, respondent began an examination of Mr. Hall regarding his 1989, 1990, and 1991 taxable years. James T. Givens, a revenue agent for the Internal Revenue Service, conducted the examination of Mr. Hall. The main issue in this examination concerned the deduction of expenses on Mr. Hall's returns. Mr. Givens requested documentation from Mr. Hall in order to verify the payment of these expenses. Petitioner was the largest recipient of these payments.

Mr. Hall engaged Roger Clark to reconstruct his records. Based on his reconstruction, Mr. Clark prepared an affidavit for petitioner's signature in order to substantiate Mr. Hall's deduction for contract labor. On November 21, 1992, petitioner signed an affidavit stating that he "received cash payments from

James E. Hall and/or Gulf Coast Construction[4] for fees for construction consulting, materials and commissions" in the following amounts:

|  | Amount |
| Year | Received |
| 1989 | $142,377.00 |
| 1990 | 76,450.00 |
| 1991 | 180,608.50 |
| Total | $399,435.50 |

In February 1993, Mr. Clark prepared Forms 1099 for Mr. Hall. Shortly thereafter, petitioner received Forms 1099 for 1989, 1990, and 1991 from Mr. Hall. These Forms 1099 reflect the same amounts as stated in petitioner's affidavit signed in November 1992.

Mr. Givens ascertained that the payments from Mr. Hall had not been reported on petitioner's original Federal income tax returns. Mr. Givens spoke with petitioner on February 3, 1993, by telephone. During this conversation, Mr. Givens identified himself and requested a meeting with petitioner the following day, February 4, 1993. Mr. Givens advised petitioner that his returns for 1989, 1990, and 1991 were under examination and to bring copies of his tax returns for those years and all records available that were used to prepare them. Petitioner

---

[4]There is no explanation in the record regarding Gulf Coast Construction. However, we assume that it was a business name for Mr. Hall, since petitioner has stipulated that these amounts were received from James Hall.

subsequently called Mr. Givens to reschedule the meeting for February 11, 1993.

On February 9, 1993, petitioner signed an Amended U.S. Individual Income Tax Return (Form 1040X) for each taxable year in issue. These amended returns, prepared by Mr. Clark and filed with respondent, reflect the payments petitioner received from Mr. Hall in the amounts as stated in petitioner's November 21, 1992, affidavit. The original and amended returns reveal the following taxable income and total taxes for the years in issue:

| Year | Original Returns | | Amended Returns | |
|------|------------------|-------|-----------------|-------|
|      | Taxable Income | Taxes | Taxable Income | Taxes |
| 1989 | $40,010 | $9,931 | $182,387 | $55,888 |
| 1990 | 20,582 | 3,086 | 97,032 | 25,342 |
| 1991 | 67,157 | 16,713 | 252,840 | 73,943 |

The increased tax liability resulting from the inclusion of the payments from Mr. Hall, as reflected on the amended returns, was paid by petitioner with the filing of the amended returns.

In the notice of deficiency, respondent determined that petitioner's correct taxable income and taxes, after adjustments and corrections, were as follows:

| Year | Taxable Income | Total Tax Liability |
|------|----------------|---------------------|
| 1989 | $182,387.00 | $54,935.00 |
| 1990 | 96,302.00 | 25,101.00 |
| 1991 | 256,237.19 | 76,583.83 |

These adjustments and corrections resulted in the overassessments and deficiency reflected in the notice of deficiency issued to petitioner.  In addition, respondent determined that the difference between the taxes as stated in petitioner's original Federal income tax returns for 1989, 1990, and 1991, and the corrected taxes for those years, is subject to the fraud penalty under section 6663(a).  Sec. 1.6664-2(c), Income Tax Regs.

## OPINION

The only issue for decision is whether petitioner is liable for the fraud penalty for each of the years 1989, 1990, and 1991. Section 6663(a) provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud.  In order to establish petitioner's liability for fraud, respondent bears the burden of proving by clear and convincing evidence:  (1) An underpayment exists for each of the years in issue; and (2) that some portion of the underpayment is due to fraud.[5]  Sec. 7454(a);

---

[5]Section 6663(b) provides:

If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.

Rule 142(b); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

In the instant case, petitioner does not contest the existence of underpayments for taxable years 1989, 1990, and 1991. Thus, the sole issue for us to decide is whether respondent has proved by clear and convincing evidence that some portion of each underpayment is due to fraud. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Petzoldt v. Commissioner, supra at 698. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent's burden is met if it is shown that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Petzoldt v. Commissioner, supra at 699. Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Direct evidence of the requisite fraudulent intent is seldom available; thus, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Spies v. United States, 317 U.S. 492, 499 (1943); King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 516 (1992). The taxpayer's entire course of conduct may establish the requisite intent. Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).

Courts have relied on a number of indicia of fraud, and the existence of several factors is persuasive circumstantial evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603. The factors relevant here are: (1) Substantial understatements of income; (2) dealing in excessive amounts of cash; (3) maintenance of inadequate records; and (4) implausible or inconsistent explanations of behavior. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Upon examination of the entire record, we conclude that petitioner's underpayment of Federal income taxes for 1989, 1990, and 1991 is attributable to fraud.

Petitioner substantially understated his taxable income on the original Federal income tax returns filed for each of the years in issue. Such consistent and substantial understatement of income constitutes strong evidence of fraudulent intent. Grudin v. Commissioner, 536 F.2d 295, 296 (9th Cir. 1976), affg. T.C. Memo. 1974-251; Ruark v. Commissioner, 449 F.2d 311, 313 (9th Cir. 1971), affg. T.C. Memo. 1969-48; Otsuki v. Commissioner, supra at 107-108; see also Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938) (held that discrepancies of 100 percent and more between real net income and the reported income for 3 successive years strongly evidence an intent to defraud the Government). We are mindful that fraud cannot be inferred from a mere inadvertent understatement of income. Holland v. United States, 348 U.S.

121, 137 (1954)  However, petitioner's understatements of income in each of the 3 years involved were both substantial in amount and in proportion to the amounts reported on his original Federal income tax returns.[6]

Extensive dealing in large amounts of cash also constitutes evidence of fraud.  <u>Estate of Mazzoni v. Commissioner</u>, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37.  Petitioner received cash payments from Mr. Hall approximately every other week.  These cash payments totaled $142,377 in 1989, $76,450 in 1990, and $180,608 in 1991.  The reason that dealing in large amounts of cash is evidence of fraud is that cash is difficult to trace unless the taxpayer maintains contemporaneous and accurate records.

Petitioner kept no records to reflect accurately his receipt of large amounts of cash income.  The failure by a knowledgeable taxpayer to maintain adequate records is evidence of fraud. <u>Galant v. Commissioner</u>, 26 T.C. 354, 365 (1956).  Petitioner was a knowledgeable businessman.  He was the director of a department that had an annual budget in excess of $1.2 million.  In addition to this position, petitioner operated a construction consulting business as a sole proprietorship.  He was a general partner in a real estate partnership, a shareholder in an S corporation, and

---

[6]Petitioner reported a total taxable income of $127,749 on his returns for the 3-year period, whereas his true taxable income for those years was determined to be $534,926.19, an understatement of $407,177.19 for the 3-year period.

an owner of several rental properties. With the exception of the unreported cash payments from Mr. Hall, petitioner maintained records for all his endeavors. During the years in issue, petitioner issued 39 Forms 1099 to various subcontractors in the conduct of his consulting business. Petitioner documented each and every payment made to these individuals throughout the 3-year period. In addition, petitioner supplied his return preparer, Mr. Pressley, with receipts and documentation for all expenses stated on his Federal income tax returns. Petitioner's recordkeeping included retention of documentation for a $3.26 expense. Petitioner was obviously aware of his obligation to maintain adequate records of his income and expenses. His failure to maintain any record of the substantial cash payments received from Mr. Hall was inconsistent with his normal practice. This pattern of omission was not a good faith or negligent error. See Kendrick v. Commissioner, T.C. Memo. 1980-270.

Petitioner testified that he was expecting Mr. Hall to supply him with Forms 1099 reflecting his income and, thus, did not maintain records of receipts from Mr. Hall. But this explanation cannot account for petitioner's failure to keep records after 1989, when it was surely apparent that Mr. Hall was not going to give petitioner timely Forms 1099. Nevertheless, petitioner continued his practice of maintaining no records of income from Mr. Hall.

Petitioner's testimony regarding his compensation arrangements with Mr. Hall, and his failure to keep track of amounts due from Mr. Hall, was not credible. Petitioner testified that payments varied and that there was no set amount or percentage that determined what Mr. Hall was to pay him.

Q. What was the purpose of Mr. Hall's payments to you, Mr. Hill?

A. In many areas, we worked around the property, of which I didn't take off work, et cetera, and propose [sic] to help him in order to help him with his work. And that was basically the extent of it.

Q. Okay. And how much were you paid for this?

A. It varied.

Q. How about your --

A. There was no set amount.

Q. -- was it about 25 percent of what Mr. Hall was paid by Bay Point?

A. I can't say that it was that. I don't know, sir, and I don't remember the exact amounts. It was not ever requested in the exact amount.

Q. How did you ever know that you were getting the right amount of payment from Mr. Hall?

A. I guess I trusted him.

Q. So, you had no set arrangement with Mr. Hall as to how much you were to be paid.

A. No, sir. Not on that. I did not.

Q. And so how would it work with Mr. Hall? At the end of the week, how would you get paid?

A.   Normally on -- not on any given time.  He would just
     come over and pay me, and say, This is what I owe you.
     And I said, Fine.

Q.   And you would just say, That's fine.

A.   That's correct.

Petitioner's explanation for his failure to report, or even to estimate, the income received from Mr. Hall on his 1989, 1990, and 1991 returns was both inconsistent and implausible.  See Factor v. Commissioner, 281 F.2d 100, 129 (9th Cir. 1960), affg. T.C. Memo. 1958-94.  Petitioner contends that he did not report the income he received from Mr. Hall because Mr. Hall failed to issue Forms 1099 to him for the years in issue and petitioner had no way of estimating the amount of the payments.[7]  Petitioner's testimony explaining why he did not estimate the amount of these payments on his tax returns is less than clear:

Q.   Was it possible to determine how much you received,
     based on deposits to bank accounts or other
     documentation?

A.   Not based on that because there were some expenses
     involved.

Q.   Explain that to us, if you would.  How were the
     expenses entered into this?

A.   Well, there was equipment that was purchased, vehicles
     that were purchased, et cetera.

_____

[7]Citing Harper v. Commissioner, 54 T.C. 1121, 1141 (1970), petitioner argues that the nonreceipt of a Form 1099 is a mitigating factor in cases where, as here, the taxpayer reports all of his other income.  However, that case is distinguishable on its facts and does not support petitioner's argument.

Q. That was purchased by whom?

A. Through Mr. Hall.

Q. Was that somehow related to what you were supposed to have received as income?

A. It would have been part of it. Yes. I would have had owned part of it.

Q. So, is it true that the amount of cash might not necessarily reflect the total amount of income you received?

A. Say that again now?

Q. Is it true that the amount of cash you received may not necessarily be the amount of income that was reportable by Mr. Hall?

A. Correct.

Q. And you testified, I believe, that you didn't know how much that was?

A. Right.

Q. And the correct numbers are going to depend upon how much of these expenses Mr. Hall was going to charge to you versus charging to himself?

A. Right.


It appears from petitioner's testimony that he is asserting that it was impossible for him to estimate the amount of income received from Mr. Hall because, in addition to the large amounts of cash that petitioner received directly from Mr. Hall, some unknown amount was also paid by Mr. Hall on petitioner's behalf to some undisclosed third party. This vague testimony is inconsistent with the statement petitioner made in his signed

affidavit.  In that affidavit, petitioner declared that <u>he</u> received cash payments totaling $399,435.50 from Mr. Hall.  The affidavit does not mention any payments made "through" Mr. Hall to some unknown third parties, as petitioner now contends. Furthermore, the record contains no documentation or other corroborating evidence regarding these alleged expenses.

Moreover, petitioner does not explain how these expenses related to the income he received from Mr. Hall.  Petitioner testified that the work he performed for Mr. Hall included the estimation and preparation of bids.[8]  We find it implausible that the nature of this work would require petitioner to share expenses with Mr. Hall or to make capital expenditures for vehicles and equipment.

Petitioner contends that he "felt uncomfortable" estimating his income on his Federal income tax returns because, in his view, "falsely representing the amount of such income was worse than making no representation at all."  However, in order to extend the time to file his Federal income tax returns, petitioner filed a Form 4868 in each of the years in issue in

---

[8]On direct examination regarding the nature of the payments he received from Mr. Hall, petitioner testified as follows:

A.   I did estimating type work, helping him prepare his things.

Q.   Helping him prepare what things?

A.   His bids and prices of what he needed to do.

which he was required to estimate his expected tax liability. Form 4868 provides that the taxpayer can estimate this amount so long as that estimate is reasonable.

Petitioner stated on his 1989 Form 4868 that he expected his total tax liability for 1989 to be $9,404. After including the income from Mr. Hall, petitioner's total tax liability was determined to be $54,935. Petitioner's estimate of $18,650 on his 1990 Form 4868 was much closer to his total tax liability for 1990, which was determined to be $25,101. However, when petitioner filed his 1990 Federal income tax return, he stated that his total tax liability for 1990 was only $3,086 and claimed and received a refund of $15,564. On his 1991 Form 4868, petitioner stated that he expected his 1991 total tax liability to be $16,675, when, in fact, it was determined to be $76,583.83. Therefore, even though Form 4868 specifically provides that it is appropriate to make an estimate, in at least 2 of the 3 years in issue, petitioner obviously failed to include any reasonable amount of income from Mr. Hall in his estimated total tax liability.

Finally, petitioner asserts that he is not liable for the fraud penalty because he relied on Mr. Pressley's advice in filing his original Federal income tax returns for 1989, 1990, and 1991. Generally, the duty of filing accurate returns cannot be avoided by placing responsibility on a tax return preparer. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987); Bailey

v. Commissioner, 21 T.C. 678, 687 (1954). It is possible for reasonable reliance on a competent agent to be a sufficient defense to fraud. Davis v. Commissioner, 184 F.2d 86, 88 (10th Cir. 1950), remanding a Memorandum Opinion of this Court. Generally, such reliance indicates an absence of fraudulent intent only when the agent has been provided with complete information and there is no other evidence indicating fraudulent intent. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.

There are several problems with petitioner's placing the blame for his underpayment of taxes with Mr. Pressley. First, Mr. Pressley testified that after petitioner informed him of income from Mr. Hall, he advised petitioner to obtain a Form 1099 from Mr. Hall. When petitioner told Mr. Pressley that it would not be possible to obtain the information from Mr. Hall, Mr. Pressley advised petitioner to estimate the amount of payments and file an amended return after receiving the correct information. Petitioner chose not to follow this advice and filed his returns showing only the income that he had documentation for. Consequently, we do not find that petitioner relied on Mr. Pressley's advice. Second, petitioner did not provide Mr. Pressley with complete information. In any event, petitioner failed to tell Mr. Pressley about the amounts involved. The unreported payments from Mr. Hall constituted over three times the amount of taxable income reported on petitioner's

original Federal income tax returns.  Accordingly, we find that Mr. Pressley's preparation of petitioner's returns is not a sufficient defense to fraud.

Petitioner contends that it was his intention to file amended returns as soon as he received Forms 1099 from Mr. Hall. We find that it is more reasonable to infer from petitioner's entire course of conduct that his true intention was to conceal the payments he received from Mr. Hall and to take his chances that his fraud would not be discovered.  Petitioner was aware of the exact amount of the payments he received no later than November 21, 1992, when he signed the affidavit.  However, it was not until after respondent began an examination of petitioner's returns for the years in issue in February 1993 that he amended his returns and paid his taxes.  The fraud was committed, and the offense completed, when the original return was prepared and filed.  See United States v. Habig, 390 U.S. 222 (1968); Plunkett v. Commissioner, 465 F.2d 299, 302-303 (7th Cir. 1972), affg. T.C. Memo. 1970-274.  "Any other result would make sport of the so-called fraud penalty.  A taxpayer who had filed a fraudulent return would merely take his chances that the fraud would not be investigated or discovered, and then, if an investigation were made, would simply pay the tax which he owed anyhow and thereby nullify the fraud penalty."  George M. Still, Inc. v. Commissioner, 19 T.C. 1072, 1077 (1953), affd. 218 F.2d 639 (2d Cir. 1955).

We conclude that the record contains clear and convincing evidence of petitioner's intent to conceal, mislead, or otherwise prevent the collection of taxes on the unreported income for the years in issue.  We hold that the understatements of tax attributable to the unreported income from Mr. Hall were due to fraud.  Petitioner has not established that any portion of the underpayment is not due to fraud.  See sec. 6663(b).  Accordingly, we sustain respondent's determination that petitioner is liable for the fraud penalties.

Decision will be entered under Rule 155.